# IN THE SUPREME COURT OF IOWA

No. 09–1500

Filed April 20, 2012

**STATE OF IOWA,**

Appellee,

vs.

**KENNETH LEE MADSEN,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Webster County, Kurt L. Wilke, Judge.

Defendant appeals his convictions on two counts of second-degree sexual abuse and one count of lascivious acts with a child. **COURT OF APPEALS DECISION VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger and Susan R. Krisko, Assistant Attorneys General, and Ricki L. Osborn, County Attorney, for appellee.

**WATERMAN, Justice.**

In this case, we review our promise-of-leniency doctrine and related issues to determine the admissibility of the confessions of defendant, Kenneth Lee Madsen. A Webster County jury that heard part of his confessions found him guilty on two counts of sexual abuse in the second degree in violation of Iowa Code section 709.3(2) (2007) and one count of lascivious acts with a child in violation of Iowa Code section 709.8. Madsen argues the district court erred in failing to suppress his confessions because (1) his first of two interviews was not recorded electronically, and (2) his confessions were involuntary under the constitutional totality-of-the-circumstances test due to the detective's threat to make him late for work in the first interview and promise in the second interview that if Madsen told him everything he could thereby keep his name out of the local newspaper and put the matter behind him. The district court ruled police are not required to videotape or audiotape noncustodial interviews and Madsen's confessions were voluntary and admissible. On appeal, Madsen also claims his trial counsel was ineffective for not attempting to suppress his confession under our common law evidentiary test for promises of leniency. In response, the State invited our court to abandon the evidentiary test in favor of the totality-of-the-circumstances test.

We transferred the case to the court of appeals, which affirmed Madsen's convictions and rejected his ineffective-assistance claim based on its conclusion no promise of leniency was made. On further review, we decline to require audio or video recording of noncustodial interviews, and we decline to abandon our evidentiary test for promises of leniency. We conclude Madsen's trial counsel breached an essential duty by failing to move to suppress his confessions under that test. We hold the

interrogating officer made promises of leniency that require suppression of part of Madsen's confession, but Madsen's self-incriminating statements made before those promises remain admissible. As a result, Madsen is entitled to a new trial on one count of second-degree sexual abuse, but his two remaining convictions are affirmed based on lack of prejudice. The decision of the court of appeals is vacated, and the district court convictions and sentences are affirmed in part and reversed in part.

## I. Background Facts and Proceedings.

Madsen met the victim, D.M.K., when the child was in kindergarten after the boy's family moved into Madsen's Fort Dodge neighborhood. D.M.K. began spending time with Madsen when D.M.K. was about seven years old. D.M.K. visited Madsen's apartment, sometimes alone and sometimes with his brother, D.K., and other young boys. Madsen had a Nintendo 64 at his apartment the boys used for computer games. Madsen took the boys bowling and on walks in wooded parks. Madsen had a police radio scanner and sometimes took the boys "cop scanning"—going to the scenes of accidents and police calls. D.M.K. occasionally spent the night at Madsen's apartment.

In the summer of 2008, D.M.K., D.K., and their older sister were sitting on the front porch of their house with other children. The conversation turned to sex, and D.K. said to D.M.K., "Why don't you tell about you and Kent [Madsen]." D.M.K. said D.K. was "lying" and went into the house. The sister confronted D.M.K. alone to inquire, saying she needed to know what happened. D.M.K. began to cry. D.M.K. told her that Madsen had measured his penis with a ruler he called a "peter meter" and that D.M.K. slept naked at Madsen's home. The sister told

their mother, who contacted the Iowa Department of Human Services (DHS).

In July, Jodie Keller, a child protective worker with DHS, called Madsen and asked if they could meet to discuss child abuse allegations. Madsen had previously completed a sixteen-week course of study at the Fort Lauderdale, Florida Police Academy and graduated from that program. He admitted he learned at the Academy that a person has a right to leave an interview if he is not in custody. Madsen agreed to meet at the DHS office in Fort Dodge. Because of the possibility of criminal charges, Keller invited Fort Dodge police detective Jody Chansler to attend the interview. At the DHS interview, which was conducted without audio or video recording, Madsen admitted he had used a ruler to measure the penises of several boys who were eight to ten years old. Madsen also admitted at this unrecorded interview the boys had masturbated at his apartment a number of times and that he had not told their parents. Madsen does not claim he was in custody for the DHS interview.

Detective Chansler followed up with a second interview of Madsen on August 6. Madsen agreed to meet in an interview room at the Fort Dodge police station. This time the interview was recorded by audiotape and by videotape with sound. A transcript of the audiotape is included in the court record. The video recording begins with Chansler opening and closing the door to show it remained unlocked. The interview began with this exchange:

> [DETECTIVE CHANSLER]: You are here on your own free will.
>
> [MADSEN]: Yes.
>
> Q. You can get up and leave at any time, do you agree to that? A. Yes.

Chansler then referred back to Madsen's interview at the DHS office several weeks earlier and reviewed the names of the five boys who had spent time at his apartment, including D.M.K. and D.K. Chansler then noted, "When we spoke to you last you gave us the information . . . about the measuring of the penises." Madsen stated, "That was poor judgment on my part but . . . I don't feel I really did anything all that wrong." The interview continued as follows:

> Q. Okay. Run me back through that so I know what you did and why you think that wasn't wrong? A. Uh going back to those . . . thinking the night they had done it . . . I think that was one of the nights when [D.M.K.] was there. He had told [S.] you know . . . he showed them the ruler and said you know why don't you measure your dick. . . . And uh . . . [D.M.K.] had an erection and he turned around and he kind of stuck it up and he was showing you know everybody how he was doing it. And he didn't think he was doing it right so he had asked me if I would help him and show him how to do it. I said well I'd rather not and he goes come on just . . . you know I don't know if I'm doing this right. I tried to explain it to him . . . and he goes here just do it. So I went over and I slid it in and tried to sit and measure it, and I told him how big it was and I went and sat the ruler down. So then everybody else started you know measuring theirs and I went back and sat on the bed watching TV.

The video at this point of the interview includes gestures indicating Madsen had placed his hand on D.M.K.'s penis to hold the ruler against it. Madsen continued to describe how he had helped five different boys measure their penises on six different days or nights.

Chansler then referred back to the DHS interview at which they discussed how boys masturbated at his home and walked in on Madsen masturbating. The boys that masturbated included D.K. and D.M.K. Madsen admitted D.M.K. masturbated "a lot" at Madsen's residence.

Madsen made these self-incriminating statements during the videotaped interview before Detective Chansler made the following promises of leniency at issue:

> Q. Okay. *You want this to go away right?* A. Well yeah.

> Q. Because you have a good job, you have a life, and you . . . A. I made a poor choice.

> Q. *And you want this to be done with* . . . this . . . A. I thought it was over. I thought the decision was made . . . I'm waiting for the other shoe to basically drop right now.

> Q. Well here is what I need from you okay and I've explained to you once when we spoke before . . . you've got . . . in order for this case to get wrapped up, in order for you to go along with your life I have to know everything. A. Yeah.

> Q. And there is more information that I know that happened that you haven't told me about so that's going to keep the investigation open until I get everything and I'm satisfied with. *I mean you don't want this in the* Messenger [the Fort Dodge daily newspaper] *do you?* A. No.

> Q. *You don't want your family . . . your job to open the* Messenger *and see your photograph and see my name saying that you're under investigation for this, this, this . . . you want it over with now, right?* A. Yes. I'm trying.

> Q. *Well you've got to . . . you've got to come clean on everything.* A. That's what I'm doing.

> Q. Okay. So tell me about [S.] . . . the whole anal thing . . . I know there was . . . A. The whole what?

> Q. Okay at any time did any of the boys asked [sic] you for help or anything with like anal sex . . . and before you answer that think about what I just said about this investigation getting wrapped up and getting over with so you can move on with your life. I need you to tell me everything that went on in that apartment. I'm not arresting you today. I've already explained that . . . these boys have already had . . . they've already been down to Des Moines . . . they've already been interviewed by different people that specialize in this thing. Okay there is so much evidence . . . so much . . . uh . . . I got all kinds of videos, statements, evidence . . . and my last piece is you telling us the truth or this investigation is not going to be open and I'm just going to keep going and keep going so . . . I need you to make it over with. I can't make it over with you unless [you] help out. A. Well I can't tell you anymore . . . it didn't happen. I

mean you know . . . well maybe you don't know . . . I don't have any problem with cooperating with police, I always have.

Q. I agree with that.

(Emphasis added.)

The interview then continued with more than twenty minutes of Madsen being evasive and denying specific allegations of sexual conduct while acknowledging the boys took baths at his home and that he helped them bathe. About twenty-four minutes after Chansler's comment about the *Messenger*, Madsen admitted D.M.K. had grabbed his [Madsen's] penis, which got hard. Madsen then talked about D.M.K. playing with his erect penis for minutes, but denied ejaculating.

Both Chansler and Madsen remained calm and conversational throughout the entire interview. No voices were raised. Both men remained seated during their dialogue. Chansler never made a threatening gesture or movement towards Madsen. Madsen described his conduct with the boys in a matter-of-fact tone.

Under further prompting by Chansler, Madsen described attempted anal sex by D.M.K. and J. in Madsen's presence. Madsen offered the boys lubricant and used his hands to "stage them." Madsen said he told D.M.K. and J. to cease the anal sex if it was painful. Madsen told Chansler that helping the boys attempt anal sex made him uncomfortable because Madsen himself had been raped when he was a teenager. Madsen volunteered that "everyone kind of experimented at some point in time in life" and attributed the anal sexual activity as the boys' "kind of experimentation stage." Moments later, Detective Chansler turned off the audio tape recorder while the video recording captured their final dialogue:

A. So where do we go from here?

> Q. At this point in time, Kent, all I'm doing is, is compiling a report okay? The county attorneys look it over and they will deem whether or not they want to do anything with it okay? That's it. A. So they still could issue a warrant at this point?
>
> Q. They could, yes. That's possible. A. Wonderful.
>
> Q. But, I'm not saying that's going to happen and I'm not saying it isn't going to happen. I don't know. They have to look over all the evidence, all the paperwork. It's not going to happen anytime soon. I'll let you know if it does. But they will have to review it. Okay? Anything else you want to discuss . . . ?

Madsen displayed no sense of surprise or betrayal when told the county attorney could charge him. He calmly walked out of the interview room.

Madsen was charged with multiple counts of sexual abuse in the second degree and lascivious acts with four boys. The district court granted his motion for separate trials. Madsen moved to suppress his confessions at both interviews as involuntary and on grounds the first interview was not recorded electronically. Madsen alleged Detective Chansler used "various statements and tactics to override [his] will by making promises and threats." And he claimed the detective's tactics rendered his confession involuntary under the Fifth and Fourteenth Amendments of the United States Constitution and article I, section 8 of the Iowa Constitution. In his brief supporting the motion, Madsen cited state and federal cases applying a totality-of-the-circumstances voluntariness test and performed a totality-of-circumstances analysis. The district court found Madsen's statements were voluntary under the totality of the circumstances, and the failure to record the first interview did not require suppression. D.M.K.'s case proceeded to jury trial.

The jury heard testimony from D.M.K. and his brother, D.K., and heard Madsen's confessions. Madsen testified and denied any sexual contact with D.M.K. Madsen explained that he made admissions to

Detective Chansler to avoid public humiliation and loss of his job if he did not cooperate. D.K. testified he saw Madsen "jacking off" with his hand on D.M.K.'s penis and that Madsen used a ruler to measure his penis and his brother's. D.M.K. testified Madsen would pull down his pants to measure his penis and that Madsen wore no clothes when D.M.K. was at his apartment. D.M.K. described Madsen as masturbating while touching D.M.K.'s penis, that Madsen would touch D.M.K.'s penis "pretty often," and that Madsen put his mouth on D.M.K.'s penis.

The jury acquitted Madsen on the count alleging oral sex—an act Madsen never admitted in his confessions. The jury found Madsen guilty on two counts of second-degree sexual abuse and one count of lascivious acts with a child. The district court denied Madsen's motion for a new trial and sentenced him to twenty-five-year terms of imprisonment for each count of second-degree sexual abuse and a ten-year term for the lascivious acts with a child. The terms are to be served consecutively.

Madsen appealed, and his appeal was transferred to the court of appeals. On appeal, Madsen argues the district court erred in refusing to suppress evidence as a result of the State's failure to record his noncustodial first interview and erred in finding his confession was voluntary under the totality of the circumstances. Madsen also claims his trial counsel was ineffective for not attempting to suppress his confession in the second interview pursuant to the nonconstitutional, evidentiary promise-of-leniency test favored in *State v. McCoy*, 692 N.W.2d 6, 28–29 (Iowa 2005).

A three-judge panel of the court of appeals unanimously affirmed Madsen's convictions, concluding electronic recording is not required and that Madsen's confessions in both interviews were voluntary. The

appellate court rejected Madsen's claim his confession was induced by threats or a promise of leniency:

> Detective Chansler made statements and asked questions some of which when viewed individually or in some combinations might arguably be considered to be promises of leniency. However, the exchanges between Chansler and Madsen that we have quoted, when taken as a whole, demonstrate that Chansler intended, and Madsen understood, that Chansler was referring to his investigation and was indicating only that when he became satisfied Madsen had disclosed everything relevant to the investigation that had transpired, then the investigation would be concluded. Chansler's statements and questions gave no assurance that by cooperating with the investigation Madsen might gain in some manner relating to possible charges or punishment. We find no error in the district court's determination that Madsen's statements in the second interview were voluntarily made and therefore should not be suppressed.

We granted Madsen's application for further review.

**II. Scope of Review**.

We review de novo Madsen's constitutional challenges to the admissibility of his confessions. We give deference to the district court's fact-findings because of its ability to assess the credibility of the witnesses, but we are not bound by those findings. *State v. Crawford*, 659 N.W.2d 537, 541 (Iowa 2003). We review de novo Madsen's claim his trial counsel was ineffective. *State v. Fannon*, 799 N.W.2d 515, 520 (Iowa 2011).

**III. Failure to Electronically Record the First Interview.**

Madsen first made incriminating admissions when he was interviewed by DHS employee Keller at her office with Detective Chansler present. This interview was not videotaped or audiotaped. Madsen contends the "failure to electronically record interrogations should render them inadmissible." We disagree. The district court correctly rejected Madsen's argument, stating, "While the fact that the interview was not

recorded is bothersome to this court, it is not of such an egregious or suspicious nature to require suppression of defendant's statements."

Madsen on appeal relies on our statement in *State v. Hajtic*, "We believe electronic recording, particularly videotaping, of *custodial* interrogations should be encouraged, and we take this opportunity to do so." 724 N.W.2d 449, 456 (Iowa 2006) (emphasis added). In *Hajtic*, a videotape of the confession assisted our de novo review in which we rejected the defendant's arguments that his self-incriminating statements were made involuntarily due to his difficulty understanding English. The videotape enabled our court to observe the defendant's responses to questions in a manner that made clear he understood them. *Id.* We did not say in that case that unrecorded confessions were inadmissible, and we decline Madsen's invitation to take that step now. As the court of appeals observed:

> The *Hajtic* decision, specifically refers to *custodial* interrogation. It is clear that Madsen was not in custody at the time of the first interrogation. Keller, an employee of DHS telephoned Madsen and left a voice message. Madsen returned her call and they set up an appointment at DHS offices in Fort Dodge. The interview was described as "pleasant," and lasted about one hour. Madsen was free to leave, and left at the end of the interview. Madsen was not deprived of his freedom in any significant way. While it would have been better if the interview had been recorded, we conclude that information obtained as a result of the interview was not inadmissible due to the lack of electronic recording.

(Citations omitted.)

We reiterate our admonition in *Hajtic* encouraging videotaping of custodial interrogations. Since *Hajtic* was decided, "the use of video recordings as evidence at trial has become a common practice . . . to further the truth-seeking process." *People v. Kladis*, 960 N.E.2d 1104, 1110 (Ill. 2011) (also recognizing videotape "objectively document[s] what

takes place by capturing the conduct and the words of both parties"). We also encourage electronic recording of noncustodial interviews when it is practical to do so. But, because noncustodial interrogations occur under a variety of circumstances, we decline at this time to adopt a per se rule requiring electronic recording. Madsen concedes his interview at the DHS office was noncustodial. We hold the failure to electronically record Madsen's first interview does not render his confessions inadmissible.

**IV. Detective Chansler's Alleged Threat to Make Madsen Late For Work.**

Madsen argues he made involuntary admissions in his first interview to avoid being late for work after Detective Chansler threatened to keep him there all day until he told him what he wanted to hear. The district court heard the testimony of Detective Chansler and DHS employee Keller denying any pressure to continue the interview. Madsen came and left voluntarily and departed ahead of the time he said he needed to leave for work. The district court found Madsen's admissions in the first interview were voluntary and not the product of any threat or coercion. We agree. It defies common sense that Madsen would confess to class B felonies to avoid getting in trouble for being late for work. We are not inclined to suspend disbelief in our de novo review of the record. *See United States v. Jacques*, 784 F. Supp. 2d 48, 56 (D. Mass. 2011) (finding confession voluntary because "it defies credulity to think that Trooper Mazza told Defendant, and that Defendant believed, that confessing to an arson would result in his immediate release from custody").

**V. Madsen's Constitutional Voluntariness Claim.**

Madsen moved to suppress his statements to Detective Chansler in the second interview as "involuntary" and "obtained in violation of . . .

the 5th and 14th Amendments to the Constitution of the United States and, the Constitution of Iowa, Article I, Section 8." We will apply the same analysis to each constitutional provision. *See In re Det. of Garren*, 620 N.W.2d 275, 280 n.1 (Iowa 2000) (refusing to deviate from federal analysis in considering state constitutional claim because appellant "ha[d] suggested no legal deficiency in the federal principles . . . nor ha[d] he offered an alternative test or guidelines").

For the reasons set forth in the next division of this opinion, we are reviewing the promise-of-leniency claim under our common law evidentiary test. Because we hold Madsen's confession that followed the promise of leniency must be suppressed under that test, we do not decide whether that part of his confession was involuntary under the totality-of-the-circumstances test. We will address Madsen's claim that his confession which preceded the promise of leniency was involuntary under the totality test, and we confine this analysis to the earlier part of his confession.

Under a constitutional totality-of-the-circumstances voluntariness analysis, statements are voluntary if the defendant's will is not overborne or his capacity for self-determination is not critically impaired. *State v. Bowers*, 661 N.W.2d 536, 541 (Iowa 2003).

> A number of factors help in determining voluntariness. Among them are: defendant's age; whether defendant had prior experience in the criminal justice system; . . . whether deception was used; whether defendant showed an ability to understand the questions and respond; the length of time defendant was detained and interrogated; defendant's physical and emotional reaction to interrogation; whether physical punishment, including deprivation of food and sleep, was used.

*State v. Payton*, 481 N.W.2d 325, 328–29 (Iowa 1992) (citations omitted).

The district court viewed the videotaped confession in ruling on Madsen's motion to suppress. The court ruled the videotaped confession was admissible:

> This court's impression was that Defendant discussed his involvement in the facts of the case in a matter-of-fact manner with the belief that he had done nothing wrong and was perfectly willing to voluntarily continue the conversation. This court concludes that Defendant's statements at this interview were voluntary and should not be suppressed.

The district court reached the same conclusion after the jury convicted Madsen and the court denied his motion for new trial:

> In reviewing the videotape of the interview, this Court was struck, not by any indication that the Defendant was under duress, but most by the fact that the Defendant appeared much at ease and that his statements to Detective Chansler were clearly voluntary. This Court likened the August 6, 2008 interview to two men having a conversation on a park bench. For those reasons, this Court found no substance to the Defendant's motion to suppress and the Defendant's statements were deemed admissible at trial.

Our own review of the videotape persuades us that Madsen's confession that preceded the promise of leniency was voluntary under the totality of the circumstances. Madsen was thirty-five years old and a graduate of a sixteen-week course at the Fort Lauderdale Police Academy. He admittedly knew he was not in custody and was free to leave or remain silent. Madsen remained calm throughout his interview. The video does not depict a man whose will was overborne or whose capacity for self-determination was impaired. Accordingly, Madsen was not entitled to suppression of the part of his confession that preceded the promise of leniency. We next consider whether Madsen's confession that followed the promise of leniency should have been suppressed under the common law evidentiary test if his trial counsel had raised that issue.

## VI. Madsen's Ineffective-Assistance-of-Counsel Claim.

On appeal, Madsen argues his trial counsel rendered ineffective assistance by not attempting to suppress his recorded statements under the nonconstitutional, evidentiary promise of leniency prohibition favored in *McCoy*. 692 N.W.2d at 28–29. The motion to suppress cited constitutional authority and did not cite *McCoy* or otherwise develop the evidentiary standard, nor did the district court address the evidentiary test. The evidentiary standard was not preserved for direct appeal and can only be reached under the ineffective-assistance framework. *See State v. Rodriguez*, 804 N.W.2d 844, 848 (Iowa 2011) ("Ineffective-assistance claims are an exception to our normal rules of error preservation.").

"Ineffective-assistance-of-counsel claims have their basis in the Sixth Amendment to the United States Constitution." *State v. Vance*, 790 N.W.2d 775, 785 (Iowa 2010). To establish an ineffective-assistance-of-counsel claim, a claimant must prove by a preponderance of the evidence "(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 2064–65, 80 L. Ed. 2d 674, 693 (1984)). The claimant must prove both elements by a preponderance of the evidence. *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011).

**A. Failure to Perform Essential Duty.** To satisfy the first prong of the *Strickland* test, Madsen must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. In evaluating the objective reasonableness of trial counsel's conduct, we examine "whether, in light of all the circumstances, the identified acts or

omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S. Ct. 2066, 80 L. Ed. 2d at 695. We evaluate the attorney's performance against " 'prevailing professional norms.' " *Ledezma v. State,* 626 N.W.2d 134, 142 (Iowa 2001) (quoting *Strickland,* 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694).

1. *The evidentiary test for promises of leniency.* We have held counsel breaches an essential duty when he does not attempt to suppress a confession under our evidentiary test and the confessions were induced in violation of that test. *McCoy,* 692 N.W.2d at 29 ("[C]ounsel's failure to [file a motion to suppress] constituted a breach of an essential duty."). We find the record adequate to resolve Madsen's claim on direct review. As noted in *McCoy,* there is "no strategic or tactical reason for not filing the motion." *Id.* at 27. This prong turns on whether Detective Chansler induced Madsen's statements in violation of our evidentiary test for promises of leniency.

In *McCoy,* we found officers impermissibly promised the defendant leniency under our evidentiary test. 692 N.W.2d at 29. We distinguished the evidentiary test from the constitutional test and cited to our cases that applied the evidentiary approach. *Id.* at 27–28 (citing *State v. Quintero,* 480 N.W.2d 50, 52 (Iowa 1992); *State v. Mullin,* 249 Iowa 10, 14, 85 N.W.2d 598, 600 (1957)). We recently applied this evidentiary test in *State v. Polk,* 812 N.W.2d 670, 674 (Iowa 2012). Under our evidentiary test, a " 'confession can never be received in evidence where the prisoner has been influenced by any threat or promise.' " *McCoy,* 692 N.W.2d at 27 (quoting *Mullin,* 249 Iowa at 14, 85 N.W.2d at 600).

2. *The State's invitation to abandon the evidentiary test.* The federal courts use the totality-of-the-circumstances test to review

promise of leniency issues. *See Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S. Ct. 1246, 1251–52, 113 L. Ed. 2d 302, 315 (1991). The State in this appeal urges us to use that approach for consistency and for policy reasons:

> Iowa's courts should rely on the constitutional "totality of the circumstances" test for several reasons. Under the evidentiary test, a confession may be excluded even if not induced by the officer's improper promises. "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 1257, 113 L. Ed. 2d 302, 322 (1991). The jury should not be denied the use of such evidence without a real inquiry into the actual effect of any promise of leniency that may have been made.
>
> Although it may be difficult to "measure the force of the influence used or decide upon its effect on the mind" of a defendant, *State v. Mullin*, 85 N.W.2d 598, 600 (Iowa 1957), the court should be able to sift the evidence and determine whether an alleged promise of leniency actually led the defendant to confess. . . .
>
> Use of the evidentiary approach in connection with allegations of promissory leniency can lead to inconsistencies. Such an approach places Iowa courts at odds with federal courts, in which the constitutional "totality of the circumstances" test is used and a promise of leniency is only one factor to be considered in determining whether a defendant's statement is voluntary. *See, e.g., United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000); *United States v. Larry*, 126 F.3d 1077, 1079 (8th Cir. 1997). The legal standards applicable to a particular defendant's case therefore would depend on whether he or she is charged in federal or state court. In addition, within Iowa's court system, the legal standard applicable to a defendant's claim of involuntariness would depend on whether he or she alleged promissory leniency or another type of compulsion, such as physical brutality or deprivation of food, water, or sleep. When a defendant claims that his or her confession has been extracted by compulsion, the legal framework applicable to the claim should not depend on the specific type of compulsion at issue.
>
> Because application of the evidentiary approach can lead to both exclusion of highly probative evidence that may not have been obtained through compulsion and inconsistencies in how claims of involuntariness are treated,

Iowa's courts should employ the constitutional totality of the circumstances test.

We agree these are good reasons for using the totality-of-the-circumstances test in lieu of the evidentiary, common law per se exclusionary rule. But, we note the evidentiary rule has the advantage of clarity and is a better deterrent against police misuse of threats and promises of leniency to obtain confessions. Courts and commentators have long recognized promises of leniency can induce false confessions leading to wrongful convictions of the innocent. In *Mullin*, we observed:

> Wigmore says . . . the query is, "Was the inducement such that there was any fair risk of a false confession?" Were the statements made to the accused strong enough so that it could in reason be determined that the prisoner would lie and say he was guilty when he was not, so as to gain some special favor?
>
> While it is hard to believe that a person would admit false facts showing his guilt without greater assurance than is sometimes held sufficient to make inadmissible alleged confessions, the courts feel compelled to go to the extreme to protect the weak or confused innocent party who may feel his chances of establishing his innocence are too remote to turn down what appears to be an assurance of leniency if he will confess to the crime of which he is accused. It seems more reasonable to assume that before an accused would falsify bad conduct for good conduct, he would demand some fairly specific assurance or promise of leniency, which is the obvious reason for the many decisions that a mere statement by an officer that it would be better or wiser to tell the truth, is not such an assurance or inducement as to make a statement by accused inadmissible. However, when the officer or officers go further and explain just how it will be better or wiser for the accused to speak, these statements may suddenly become more than an admonishment and assume the character of an assurance or promise of special treatment which may well destroy the voluntary nature of the confession in the eyes of the law.

249 Iowa at 16, 85 N.W.2d at 601–02 (quoting 3 Wigmore on Evidence §§ 823–24 (3d ed. 1940)).

In *McCoy*, we also reiterated that " 'the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the

prisoner, and therefore excludes the declaration if *any degree* of influence by force *or other inducement has admittedly been exerted* upon him.'" 692 N.W.2d at 27 (quoting *Mullin*, 249 Iowa at 14, 85 N.W.2d at 600 (internal quotation marks omitted)). The use of a per se exclusionary rule eliminates the need for the court to attempt to read the mind of defendant to determine if his confession, in fact, was induced by or made in reliance upon the promise of leniency.

The State previously invited us to abandon the evidentiary test in *McCoy*, and we declined to do so. In *McCoy*, we noted the district court had applied the evidentiary test and "the State filed no post-hearing motion asking the [district] court to employ the federal totality-of-the-circumstances test." *Id.* at 28. Thus, the issue was not preserved. The State faces no such obstacle here: the district court used the totality-of-the-circumstances test in ruling that Madsen's confession was admissible, and it was Madsen's trial counsel that failed to argue for the evidentiary test in district court. On balance, however, we favor the evidentiary test as the better deterrent against promises of leniency that can lead to wrongful convictions.[1]

Accordingly, we decline the State's invitation to abandon the evidentiary test in favor of the totality-of-the-circumstances test.

3. *Application of the evidentiary test.* Our court has not previously addressed whether a threat of adverse publicity in the newspaper or a promise to avoid newspaper coverage would render a subsequent

---

[1]District courts should first employ the evidentiary test to determine the admissibility of confessions challenged on grounds of a promise of leniency. If application of the evidentiary test requires suppression of the confession, the district court need not also apply a totality-of-the-circumstances test. If the district court finds the evidentiary test does not require exclusion, it should still employ the totality-of-the-circumstances test to ensure the State has met its burden of establishing that defendant's confession was voluntary.

confession involuntary. In this case, Chansler's statements about newspaper coverage were combined with statements including, "you want this to go away . . . you want this to be done with." Chansler thereby implicitly conveyed the message that by confessing Madsen could avoid public charges against him.

In *Polk*, we held "the [officer] crossed the line by combining statements that county attorneys 'are much more likely to work with an individual that is cooperating' with suggestions [the defendant] would not see his kids 'for a long time' unless he confessed." 812 N.W.2d at 676. In *McCoy*, we required a new trial because the defendant confessed after the detective told him twenty-five times that "if he didn't pull the trigger, he wouldn't be in any trouble." 692 N.W.2d at 28. In *Quintero*, we held the police improperly coerced defendant's confession by threatening that his sixteen-year-old nephew would be tried as an adult and sent to prison unless he cooperated. 480 N.W.2d at 50, 52. In *State v. Kase*, we reversed a conviction because the defendant confessed after a Division of Criminal Investigation agent told her "that if she told him what she knew about Vaughn's death and signed a consent to search her apartment no criminal charges would be filed against her; otherwise, she was told, she would be charged with murder." 344 N.W.2d 223, 226 (Iowa 1984). In *State v. Hodges*, we held that defendant's confession was inadmissible when he was told "that a lesser charge would be much more likely if he gave 'his side of the story.' " 326 N.W.2d 345, 349 (Iowa 1982). In *Hodges*, we offered some parameters:

> An officer can ordinarily tell a suspect that it is better to tell the truth. The line between admissibility and exclusion seems to be crossed, however, if the officer also tells the suspect what advantage is to be gained or is likely from making a confession. Ordinarily the officer's

statements then become promises or assurances, rendering the suspect's statements involuntary.

*Id.* (citing *Mullin*, 249 Iowa at 16–17, 85 N.W.2d at 601–02).

We find the detective's interrogation techniques impermissibly promised Madsen leniency. Detective Chansler suggested to Madsen that his confession was necessary "for this case to get wrapped up" and to keep his name out of the newspaper:

> Q. Well here is what I need from you okay . . . in order for this case to get wrapped up, in order for you to go along with your life I have to know everything.
>
> . . . .
>
> Q. You don't want your family . . . your job to open the Messenger and see your photograph and see my name saying that you're under investigation for this, this, this . . . you want it over with now, right?
>
> . . . .
>
> Q. Well you've got to . . . you've got to come clean on everything.

The statements threatened Madsen with an adverse newspaper story if he did not tell Chansler "everything." Chansler's statements also communicated to Madsen there was "an advantage . . . to be gained" if he confessed. *See id.* The investigation would "get wrapped up" quickly, Madsen could "go along with [his] life," and he could avoid newspaper publicity that would humiliate him in the community. The statements flunk our evidentiary test for a promise of leniency.

Accordingly, Madsen's counsel breached an essential duty by not moving to suppress statements made after the impermissible promises under the evidentiary promise-of-leniency test.

**B. Prejudice.** Madsen must also establish counsel's deficient performance prejudiced him. Prejudice exists if " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *State v. Graves*, 668 N.W.2d

860, 882 (Iowa 2003) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698). A "reasonable probability" means a "substantial," not "just conceivable," likelihood of a different result. *King*, 797 N.W.2d at 572. Counsel's error must "undermine our confidence in the verdict." *Id.* at 575.

Importantly, the State did not admit Madsen's entire interview into trial evidence. The State only admitted ten video clips of the interview ranging from seconds to several minutes. Detective Chansler testified about the statements contained on the video, the State cross-examined Madsen as to the video statements, and prosecutors incorporated the video clips into closing argument. The first two clips contained Madsen's admission that he measured D.M.K.'s penis with a ruler. These statements were properly admitted into evidence because Madsen made the statements before the detective's promise of leniency. *See Mullin*, 249 Iowa at 17, 85 N.W.2d at 602 (requiring threat or promise of leniency to precede confession). The remaining clips contained admissions made by Madsen after the detective engaged in improper questioning. Video clips three through ten contained statements by Madsen that he walked around naked while D.M.K. was at his apartment, that D.M.K. masturbated him for several minutes while the two laid in bed watching TV, that he did not tell the boys' parents that their sons engaged in sexual activities at his house, and that the sexual activity at his house was "something different, something wild."

We must decide whether the admission of the statements contained in video clips three through ten prejudiced Madsen. The jury convicted Madsen on three counts. We review each count separately.

1. *Count I.* Count I charged Madsen with second-degree sexual abuse in violation of Iowa Code section 709.3(2), alleging Madsen

directed D.M.K. to touch his genitals. Jury Instruction No. 9 required the jury to find:

> 1. Between July 1, 2005 and July 31, 2008, the Defendant did commit a sex act with a child, by engaging in hand (D.M.K.) to genitalia (Defendant) contact with D.M.K.
>
> 2. The Defendant performed the sex act while D.M.K. was under the age of twelve (12) years old.

"Sex act" is defined as "any sexual contact between two or more persons by: . . . contact between the finger or hand of one person and the genitalia or anus of another person." Iowa Code § 702.17. We have stated whether a "sex act" has occurred is a fact question for the jury that can "be determined from the type of contact and circumstances surrounding it." *State v. Pearson,* 514 N.W.2d 452, 455–56 (Iowa 1994).

D.M.K. testified he masturbated Madsen at Madsen's direction. D.M.K. stated Madsen "took my hand and jacked himself off" and that Madsen's penis was "hard." This testimony was corroborated by more than four minutes of impermissible video clips that showed Madsen explaining how D.M.K. masturbated him. Video clips numbers six, seven, and eight contain admissions by Madsen that D.M.K. masturbated him for several minutes while the two watched television. Madsen admitted his penis was erect.

While the jury may have found D.M.K. to be a credible witness, the admissions contained in the video clips made conviction for this count virtually certain. The statements removed any reasonable doubt effective cross-examination of D.M.K. could create. In fact, Madsen's counsel did not even attempt to impeach D.M.K. as to this testimony. Given the undeniably persuasive value of Madsen's four-minute confession, we find there is a "reasonable probability" the jury would have returned a

different verdict as to Count I if tapes six, seven, and eight were not admitted into evidence.

2. *Count II.* Count II charged Madsen with lascivious acts with a child in violation of Iowa Code section 709.8(1), for measuring D.M.K.'s penis with a ruler. Section 709.8(1) makes "it unlawful for any person sixteen years of age or older" to "[f]ondle or touch the pubes or genitals of a child" "for the purpose of arousing or satisfying the sexual desires of either of them." Jury Instruction No. 10 required the jury to find:

> 1. Between July 1, 2005 and July 31, 2008, the Defendant did fondle or touch the genitals of D.M.K., a child, with or without the child's consent, by measuring D.M.K.'s penis with a ruler.
> 2. The Defendant did so with the specific intent to arouse or satisfy the sexual desires of the Defendant or D.M.K.
> 3. The Defendant was then eighteen (18) years of age or older.
> 4. D.M.K. was under the age of fourteen (14) years old.

D.M.K. testified Madsen just "put [the ruler] up to my penis and measure[d] it." D.M.K. testified he did not ask Madsen to measure his penis and that Madsen "would just pull down my pants." Madsen had the ruler at his house and according to D.M.K. called it the "peter meter." D.M.K.'s sister testified D.M.K. told her about the "peter meter." D.M.K.'s brother, D.K., testified Madsen "would pull down me and my brother's pants and he would measure us" and that "he would do it on his own." D.K. testified he saw Madsen hold D.M.K.'s penis while he measured it. The State also admitted two video clips from Madsen's police interview.

The video clips contain statements Madsen made before Detective Chansler's impermissible questioning. The first tape lasted thirty-three seconds:

> Q. All right man . . . when we spoke to you last you gave us the information about the measuring . . . move this over here so they can hear both of us . . . about the measuring of the penises . . . . A. I'm saying that was poor judgment on my part but still I mean . . . .
>
> Q. Okay. A. I don't feel I really did anything all that wrong. I mean nothing was . . . I guess it really doesn't matter now but . . . .

The second tape contained sixteen seconds of conversation:

> Q. . . . And when you said that you helped him you had mentioned you slid it in . . . how did you do that? Describe that . . . I mean on the bottom of his penis . . . on the top . . . I mean . . . A. I put the rule under . . . you know like this and you know measured it.

Gestures on the video accompanying this discussion make clear Madsen admitted touching his hand on D.M.K.'s penis while measuring it with the ruler. This confession preceded the promise of leniency and is therefore admissible. *Mullin*, 249 Iowa at 17, 85 N.W.2d at 602.

Overwhelming evidence, therefore, establishes Madsen's guilt under Count II. The admissible evidence allowed the jury to find Madsen measured D.M.K.'s penis with the "specific intent to arouse or satisfy sexual desires." D.M.K. and D.K. both testified Madsen pulled D.M.K.'s pants down to measure D.M.K.'s penis. The boys testified to a sexually charged atmosphere, each stating Madsen "jacked off" in front of them. D.M.K.'s sister testified D.M.K. told her he slept naked on Madsen's couch. Madsen cannot show suppression of the inadmissible statements would create a "substantial" likelihood the jury would acquit him on this count. Counsel's deficient performance does not undermine our confidence in the jury's verdict on Count II.

3. *Count III.* Count III charged Madsen with second-degree sexual abuse in violation of Iowa Code section 709.3(2), for touching D.M.K.'s genitals. Jury Instruction No. 11 required the jury to find:

1. Between July 1, 2005 and July 31, 2008, the Defendant did commit a sex act with a child, by engaging in hand (Defendant) to genitalia (D.M.K.) contact with D.M.K.

2. The Defendant performed the sex act while D.M.K. was under the age of twelve (12) years old.

D.M.K. testified to the following exchange:

Q. Did [Madsen] ever touch your wiener?  A.  Yes.

Q. What did he do?  A.  Jacked me off.

Q. So he took his hand and put it on your wiener? A.  Yes.

Q. Did he do the same motion that you made earlier? A.  Yes.

Q. When he touched your wiener, did he do that more than once?  A.  More than once.

. . . .

Q. Tell me what you mean by more than once? A.  Every time I was over there, he would do it.

Q. So it happened pretty often; right?  A.  Yes.

Q. After that started happening, did you tell anybody? A.  No.

Q. Why?  A.  Because I was scared.

None of the eight inadmissible video clips contain admissions by Madsen that he masturbated D.M.K.  We also do not believe the inadmissible video clips contaminated the jury's verdict as to this count. Neither Count III nor Count IV, which alleges oral sex, was corroborated by the inadmissible statements in the video clips.  D.M.K. testified to both the masturbation and oral sex on direct examination.  The jury acquitted Madsen on Count IV, but convicted Madsen on Count III.  The acquittal resulted from counsel's effective cross-examination of D.M.K.'s oral-sex testimony.  During cross-examination, D.M.K. admitted he denied Madsen performed oral sex on him during a deposition and in an interview with Detective Chansler.  The acquittal shows the jury did not

rely on the inadmissible evidence to convict Madsen for charges unrelated to the inadmissible statements.

Madsen's counsel, however, did not attempt to impeach D.M.K.'s testimony that Madsen masturbated him. The jury found D.M.K.'s uncorroborated and unimpeached testimony that Madsen masturbated him to be credible. The inadmissible statements regarding other acts do not undermine our confidence in the jury's verdict for Count III. Madsen cannot show suppression of the video clips would create a "reasonable probability" of a different outcome on Count III.

For these reasons, we find Madsen established the requisite prejudice as to Count I alone. Madsen's conviction and sentence for Count I must be reversed. Madsen's convictions for Counts II and III are affirmed.

## VII. Resentencing.

The district court imposed consecutive sentences of the maximum twenty-five-year prison term allowed for each of Madsen's convictions for sexual abuse in the second degree (Counts I and III) and a ten-year term for lascivious acts with a child (Count II) for a total sentence of sixty years. The reversal of his conviction and sentence on Count I would still leave Madsen sentenced to a twenty-five-year and a ten-year term on the convictions affirmed on appeal to be served consecutively for a total of thirty-five years, a punishment within the district court's discretion. However, the district court considered the fact Madsen was convicted on three counts when imposing the consecutive maximum sentences. On this record, we believe it is appropriate to remand for resentencing on Counts II and III. *See State v. Gibb*, 303 N.W.2d 673, 687–88 (Iowa 1981) (remanding for resentencing upon reversal of one conviction when the district "court considered the fact of three convictions in imposing all

three sentences"); *see also State v. Keutla*, 798 N.W.2d 731, 735 (Iowa 2011) (noting our discretion to remand for resentencing, even when sentences are severable, and concluding it is appropriate to do so upon reversal of part of a combined sentencing arrangement viewed "as an interconnected package"). "We do not suggest what the sentence should be as that determination lies within the discretion of the trial court." *Gibb*, 303 N.W.2d at 688. The district court may defer resentencing on those counts until after the retrial on Count I.

### VIII. Disposition.

We affirm Madsen's convictions for Counts II and III but remand for resentencing as to those counts. We reverse Madsen's conviction and sentence for Count I and remand for a new trial on that count. Costs are taxed two-thirds to the defendant, one-third to the State.

**COURT OF APPEALS DECISION VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

All justices concur except Mansfield, J., who takes no part.