# IN THE COURT OF APPEALS OF IOWA

No. 17-0247
Filed June 6, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ISACK MAHAD ABDINUR,**
        Defendant-Appellant.
_____


        Appeal from the Iowa District Court for Woodbury County, Steven J. Andreasen, Judge.


        Defendant challenges his conviction for murder in the first degree.
**AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Stephan J. Japuntich, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Thomas J. Ogden, Assistant Attorney General, for appellee.


        Heard by Danilson, C.J., and Mullins and McDonald, JJ.

**MCDONALD, Judge.**

Isack "Zack" Abdinur challenges his conviction for murder in the first degree, in violation of Iowa Code section 707.2(1)(a) (2015). In this direct appeal, Abdinur contends the district court erred in finding he did not prove his insanity defense and the district court abused its discretion in granting a continuance over his objection.

I.

The victim in this case is Cori Stead, Abdinur's girlfriend. Abdinur and Stead had a volatile relationship. According to numerous witnesses, they argued almost daily. Many witnesses recounted Abdinur making threats of violence and using hateful language. By way of example, Abdinur told Stead, "You should just die. I wish you would die. I hate you." He accused her of cheating. He called her "a b*tch, a whore," and "a slut." Abdinur, an immigrant, told Stead, "Women in my country, when they don't listen to their men, we chop their heads off." He told her "he was going to make her pay for it if she didn't listen to him." On one occasion, he told Stead's family "if he had a beer bottle, . . . he would break it over her head," and "how these whores act, how they act, how women like that behave in Africa, we kill them."

On the night in question, June 22, 2015, Abdinur went out to a local casino with Stead and Stead's niece, Leslie Cournoyer. Abdinur and Stead were living with Cournoyer and Cournoyer's five children. According to Cournoyer, Abdinur had been drinking with friends when she and Stead picked him up to go to the casino. When he got in her car, he "looked mean." Abdinur and Stead began arguing in the car, as they often did, and Abdinur told Stead "he wished she would

die." Cournoyer testified she witnessed Abdinur punch the back of Stead's head out of the corner of her eye. The group spent a short time at the casino. They left around 9:00 p.m. and returned to Cournoyer's apartment.

Shalena Dupree, a friend of Cournoyer's, was babysitting the children. Dupree testified that when Abdinur, Stead, and Cournoyer returned home from the casino Cournoyer prepared dinner. Shortly thereafter, Cournoyer, Dupree, and the five children went into Cournoyer's bedroom to watch a movie. Both Cournoyer and Dupree heard Stead and Abdinur arguing outside the bedroom. Stead asked Cournoyer to call 911. They did not call 911 because the phone was not working. Stead then entered the bedroom, locked the door behind her, and laid on a mattress on the floor with two of the children. Abdinur requested entry into the bedroom, which was denied. He then forcibly broke the lock and entered the bedroom. According to Dupree, Abdinur told Stead "if you want the cops here then that's what we will get." Cournoyer testified Abdinur then "went towards [Stead] and grabbed her, [and] started punching her" in the face. Cournoyer told Dupree to get out, take two of the children from the room, and ask the landlord to call 911. Cournoyer then "jumped on [Abdinur's] back and tried to pull him off." After a minute or so, Abdinur got up and walked out of the room.

Cournoyer was helping Stead when Abdinur came back into the room with a kitchen knife. She witnessed Abdinur stab Stead as Stead begged him to stop. As he stabbed her, Abdinur told Stead, "This is what you want, you f*cking b*tch. F*cking hate you." Cournoyer grabbed two of her other children, fled to the balcony, and yelled for help. She heard Stead scream for help as Abdinur continued to curse and stab her. After several minutes, Cournoyer concluded she

had to leave the apartment and returned inside. She saw Abdinur in the doorway still holding the knife. She saw him toss the knife towards the kitchen before she ran outside with two of her children in tow. A short time later, she saw Abdinur walking away from the apartment in the opposite direction.

Several police officers testified about the events of the evening. A call came into dispatch at approximately 12:47 a.m. on June 23, 2015. Officers responded to the scene and cleared the home for medical personnel, but Stead was already deceased. Officers located Cournoyer's fifth child underneath a blanket next to Stead's body. The child was unharmed. There was a bloody knife on the kitchen floor and blood in the refrigerator next to some cans of beer. Several officers followed a trail of blood away from the apartment. When the visible trail disappeared, the officers used a canine to track Abdinur. As the officers walked down an alley, Abdinur, covered in blood, stepped out from a garage and said, "It's me. I'm right here." Officers located several bloody beer cans and a bloody liquor bottle in the garage. Although Abdinur initially complied with the officers' commands, he became belligerent and began flailing and spitting. Physical force was necessary to place him in a squad car and take him to the hospital to check him for injuries.

Officer Greg Rose testified that as he drove Abdinur to the hospital, Abdinur said "he didn't want to live." Abdinur also said a previous jail stay had "made him this way" because "they made him take drugs." Abdinur claimed the police spilled warm blood over his head to frame him for the murder. Abdinur received several sutures for a wound on his hand. When at the hospital, Officer Jamie Mattas testified that Abdinur was tearful, and made comments like, "I had hurt my love"

and "you know, I actually did it."  From the hospital, Abdinur was taken to an interview room at the police station.  There, he continued making similar statements, including "I hurt my love" and "I killed my love.  I don't deserve to live." At other times, he indicated that he did not believe Stead was really dead.

Abdinur was arraigned on July 7, 2015.  Abdinur waived his right to trial by jury, and the matter was tried to the bench in November 2016.  At trial, Abdinur asserted defenses of diminished responsibility and insanity.  The district court found Abdinur guilty of murder in the first degree and sentenced him to life in prison without the possibility of parole.

II.

In Abdinur's first claim of error, Abdinur challenges the sufficiency of the evidence.  Appellate counsel clarified the nature of the challenge during oral argument, explaining Abdinur does not contest the sufficiency of the evidence proving the murder but instead contends the district court erred in rejecting his insanity defense.

When a defendant raises a defense of insanity, he must prove the defense by a preponderance of the evidence.  *See* Iowa Code § 701.4.  This court reviews challenges to the sufficiency of evidence presented at trial for correction of errors at law.  *See State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011).  We review a trial court's findings as we would a jury verdict.  *See State v. Kemp*, 688 N.W.2d 785, 788–89 (Iowa 2004).  We review the record in a light most favorable to the State, and we make any legitimate inferences and presumptions that may fairly and reasonably be deduced from the evidence in the record.  *See State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002); *State v. Jacobs*, 607 N.W.2d 679, 682 (Iowa 2000)

(addressing a similar proof of insanity defense claim). "Findings of the trial court are to be broadly and liberally construed, rather than narrowly or technically, and, in case of ambiguity, we will construe findings to uphold, rather than defeat, the judgment." *State v. Dible*, 538 N.W.2d 267, 270 (Iowa 1995). Still, we consider all the evidence in the record and not just the evidence supporting the verdict. *See State v. Thomas*, 561 N.W.2d 37, 39 (Iowa 1997). Critically, we note that the finder of fact is "free to reject certain evidence, and credit other evidence." *See State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006).

The insanity defense is set forth in Iowa Code section 701.4. It provides:

A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act.

The statute is a codification of the common law *M'Naghten* standard. *See Jacobs*, 607 N.W.2d at 684. The supreme court has approved of the following explanation of the standard:

Not every kind or degree of mental disease or mental disorder will excuse a criminal act. "Insane" or "insanity" means such a diseased or deranged condition of the mind as to make a person either incapable of knowing or understanding the nature and quality of his acts, or incapable of distinguishing right and wrong in relation to his act(s).
A person is "sane" if, at the time he committed the criminal act, he had sufficient mental capacity to know and understand the nature and quality of the act and had sufficient mental capacity and reason to distinguish right from wrong as to the particular act.
To know and understand the nature and quality of one's acts means a person is mentally aware of the particular act(s) being done and the ordinary and probable consequences of them.
. . . .
Insanity need not exist for any specific length of time.

*State v. Becker*, 818 N.W.2d 135, 142–43 (Iowa 2012), *overruled on other grounds by Alcala v. Marriott Intern., Inc.*, 880 N.W.2d 699 (Iowa 2016).  *See State v. Gilmore*, No. 11-0858, 2012 WL 3589810, at \*7 (Iowa Ct. App. Aug. 22, 2012) (citing this language with approval).  "The words 'right' and 'wrong' refer to a legal, not moral, right or wrong."  *Jacobs*, 607 N.W.2d at 684.

The parties do not dispute the first element of the defense—that Abdinur suffered from a diseased or deranged condition of the mind.  It was not disputed Abdinur suffered from schizophrenia and had diagnoses for substance induced mood disorder, depression, anxiety, and polysubstance abuse.  He had been hospitalized on prior occasions.  He received psychiatric care several times in Boston in 2014.  A hospital report from that time called him "evasive," "agitated," and "paranoid" and noted he required security intervention.  In January 2015, Abdinur was involuntarily admitted to a hospital in Sioux City due to concerns of "severe psychosis."  The hospital requested and received a court order to administer long-acting medication to alleviate Abdinur's symptoms and "extreme violent behavior" towards staff and others.  Although Abindur was ordered to engage in a treatment plan following this hospitalization, he did not comply.

The parties do dispute whether Abdinur's mental condition rendered him incapable of knowing the nature and quality of the act he committed and rendered him incapable of distinguishing between right and wrong in relation to the act. The State's expert witness was Dr. Tim Kockler.  Dr. Kockler is a licensed psychologist who does a significant amount of consulting work across six states.  He has provided expert opinion in 266 criminal matters in Iowa alone.  His report was

admitted into evidence, and he provided testimony at trial. In preparing his report, Dr. Kockler reviewed extensive criminal and psychiatric records and personally interviewed Abdinur for three hours and fifteen minutes. Dr. Kockler also conducted "several hours of psychological testing." Dr. Kockler concluded that "despite the presence of schizophrenia, [Abdinur] understood the nature and quality of his criminal acts before, during, and after the crimes; and also knew what he was doing was wrong." In support of his conclusion, Dr. Kockler explained that Abdinur's statements regarding the use of the knife, fleeing the scene, and recognition that he did something wrong showed "an awareness of his . . . surroundings . . . it speaks directly to the heart of wrongfulness." Dr. Kockler explained that Abdinur's behavior, statements, and emotions "demonstrated insight and awareness of his surroundings immediately . . . following the alleged event."

The defendant's expert was Dr. Richard Frederick. Dr. Frederick is a licensed psychologist board certified in forensic and assessment psychology. Dr. Frederick has a lengthy history of performing criminal responsibility evaluations for the Department of Justice and performing other consulting work. He testified he has "encountered hundreds of individuals who have schizophrenia." His report was admitted at trial, and he testified for the defense. Dr. Frederick reviewed police and witness statements, criminal records, and psychiatric records. He personally interviewed Abdinur and conducted psychological testing. Unlike Dr. Kockler, Dr. Frederick concluded "[a]t the time of the alleged homicide, because of active, untreated schizophrenia, Mr. Abdinur was in an active state of psychosis and dissociation and unable to appreciate the nature and quality of his actions or to

distinguish right from wrong." He based this determination on Abdinur's serious psychotic condition that manifested through "paranoia, hallucinations, delusions, disorientation, decreased impulse control," among other things, the recent use of methamphetamine and alcohol, Abdinur's account and behavior which illustrated "substantial gaps in memory and rationality," and the lack of a motive.

The district court conducted a thorough and well-reasoned assessment of the competing evidence. While the district court found certain portions of Dr. Frederick's report and testimony more credible than Dr. Kockler's, the district court ultimately found Dr. Kockler's conclusion the defendant was not legally insane at the time of the murder to be more persuasive. We cannot conclude this finding was erroneous. "When conflicting psychiatric testimony is presented to the fact finder, the issue of sanity is clearly for the fact finder to decide." *Jacobs*, 607 N.W.2d at 685. "When a case evolves into a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses." *Id.*

Independently, the record as a whole, when viewed in the light most favorable to the verdict, supports the conclusion Abdinur understood the nature and quality of his act and was capable of distinguishing between legal right and legal wrong. *See id.* (analyzing expert testimony along with observations of those that encountered the defendant on a regular basis and concluding "there was sufficient evidence to support the trial court's rejection of the insanity and diminished responsibility defenses"). Abdinur explicitly expressed his understanding of the nature and quality of his act. Abdinur admitted in his interview with Dr. Kockler that he knew he had a knife, that he took the knife and entered

the bedroom, that he located Stead in the bedroom, and that he stabbed Stead. He demonstrated he understood the consequences of his act—the injury or death of Stead. Abdinur also demonstrated he was aware his conduct was legally wrong. After stabbing Stead, Abdinur fled the scene to avoid the police. He stated he left, "Because I realized something was wrong. That's when the police came to mind. Like leave the apartment before the cops come." When asked why, Abdinur replied, "Because I did something wrong. I just realized I did something wrong." Abdinur also admitted he went to a garage in an alley to "hide from the police" because "I just wounded somebody." Abdinur made similar comments to Dr. Frederick. Abdinur stated, "I stabbed two times, she grabbed the knife. I backed off and came back the [third] time and punctured her in the right side." He also demonstrated to Dr. Frederick he knew he had committed a legal wrong, stating, "I threw the blade down and washed my hands. I had cut my hands. I grabbed a little whisky and beer. I went to the garage at another house. I was, 'Oh sh*t, I did something. I need to drink these before I got to jail.'"

The district court did not commit legal error in failing to conclude the defendant proved his defense of insanity. *See, e.g., State v. Kirwan*, No. 16-1088, 2017 WL 3524772, at *4 (Iowa Ct. App. Aug. 16, 2017) (affirming murder conviction, noting the jury was entitled to evaluate and resolve conflicting expert opinion regarding insanity, and noting the jury was free to rely on the defendant's admissions regarding the act and his understanding of the same); *State v. Sherman*, No. 16-0705, 2017 WL 2461498, at *3 (Iowa Ct. App. June 7, 2017) ("Viewing the denial of the new trial ruling of the district court, we concur that Sherman simply did not prove her defense of insanity by a preponderance of the

evidence, as required by statute. It necessarily follows that the verdict was supported by substantial evidence.").

### III.

Abdinur's next claim of error relates to the district court's decision to continue the trial beyond the one-year speedy trial deadline. *See* Iowa R. Crim. P. 2.33(2)(c) ("All criminal cases must be brought to trial within one year after the defendant's initial arraignment pursuant to rule 2.8 unless an extension is granted by the court, upon a showing of good cause.").

By way of background, Abdinur was arraigned on July 7, 2015. The matter was tolled in July and August upon the request for a competency evaluation pursuant to Iowa Code chapter 812. In September 2015, Abdinur waived his right to speedy trial and jointly moved to continue the trial until January 26, 2016. The motion was granted. Subsequently, Abdinur requested new counsel due to conflicts with his appointed counsel. In January 2016, as trial approached, the district court granted Abdinur's request for new counsel, and the parties again jointly moved to continue trial until May 24, 2016, which the district court granted. In May 2016, the State moved to continue trial. In support of its motion, the State noted its expert witness was not available on the scheduled trial date and the parties had not completed discovery, including deposition. Abdinur personally resisted the motion, although his counsel agreed the parties needed more time for expert depositions and discovery. The district court granted the motion and set the trial for August 23, 2016. On July 8, the district court issued an order appointing substitute counsel—for the second time—after learning Abdinur was refusing to communicate with his counsel. After several attorneys withdrew from the

appointed representation due to conflicts of interest, substitute counsel finally entered an appearance on August 4, 2016. The State filed another motion to continue trial due to its concerns regarding the parties' inability to conduct depositions due to the numerous changes in counsel and due to its concerns regarding Abdinur receiving a fair trial. Specifically, Abdinur's newly appointed counsel would have had only three weeks to prepare for trial in the absence of a continuance. The district court granted the motion, and trial was held in November 2016.

On appeal, Abdinur presents his claim as a denial of his right to speedy trial. However, this issue was not presented to the district court. At the time the district court granted the continuance, Abdinur made a single, general objection, "I want the court to be on the same date as it is right now . . . I don't want it to be the other one, as far as postponing it." Defense counsel supported the continuance, noting it was necessary to "complete depositions of the expert witnesses," "for our expert to review [the State's expert] report," and "to gather and review" medical records. The defendant did not file a motion to dismiss based on a violation of his right to speedy trial. Under the circumstances, error was not preserved. *See State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011) (finding to preserve error, a defendant "had to alert the district court to his specific objections, and he had to do so in a timely manner")

In the alternative, Abdinur argues his counsel was ineffective in failing to resist the May continuance on speedy trial grounds. We review ineffective assistance claims de novo. *See State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). To establish a claim of ineffective assistance of counsel, Abdinur must show "(1)

his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *Id.* The defendant must prove both elements by a preponderance of the evidence. *See State v. Madsen*, 813 N.W.2d 714, 723 (Iowa 2012). "Courts generally presume counsel is competent and a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Ondayog*, 722 N.W.2d 778, 785 (Iowa 2006). "Prejudice exists if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Madsen*, 813 N.W.2d at 727.

Here, Abdinur has failed to establish counsel's failure to resist the motion to continue on speedy trial grounds was a breach of duty. Recall, in May 2016, the one-year trial deadline had not yet passed. Thus, at the time the State moved to continue trial, defense counsel was left in the position of insisting on going forward with trial without the completion of discovery necessary to present the defendant's insanity defense or consenting to a continuance to allow for full preparation of the defense. Under the circumstances, we cannot conclude counsel breached a duty in consenting to a continuance to allow for additional time to prepare the defendant's case. *See Johnson v. State*, No. 14-1043, 2015 WL 6510327, at *2 (Iowa Ct. App. Oct. 28, 2015) (finding counsel was not ineffective in analogous situation where "the attorney was placed on the horns of a dilemma" in choosing between a continuance and moving forward with trial without full preparation).

Independently, we conclude there was good cause for the delay. The matter had been tolled for a period of time in July and August of 2015 pursuant to chapter 812. Subsequently, Abdinur waived his right to speedy trial. The parties

had significant difficulty in coordinating discovery and depositions due, in part, to Abdinur's repeated conflicts with his counsel and the substitution of new counsel. Defense counsel consented to the continuance to allow for the full and fair preparation of the defendant's case. Finally, the court continued the trial from August until November because Abdinur's newly appointed counsel would have had only three weeks to prepare for the scheduled trial date. The district court's continuance protected Abdinur's right to present a defense and obtain a fair trial. The district court had good cause to justify any delay in trial. *See State v. Winters*, 690 N.W.2d 903, 909 (Iowa 2005) ("Similarly, good cause for pretrial delay under the speedy-trial rule can result from the need to complete pretrial discovery.").

## IV.

For these reasons, we affirm the defendant's conviction for murder in the first degree.

**AFFIRMED.**