# IN THE COURT OF APPEALS OF IOWA

No. 13-0997
Filed December 24, 2014

**DAVID E. WILLOCK,**
　　　　Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
　　　　Respondent-Appellee.
_____

Appeal from the Iowa District Court for Black Hawk County, Stephen C. Clarke (ruling on motion for summary disposition), and Andrea J. Dryer (postconviction trial), Judges.

David Willock appeals from the denial of his application for postconviction relief. **AFFIRMED.**

Kent A. Simmons, Davenport, for appellant.

Thomas J. Miller, Attorney General, Heather Ann Mapes, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Kim Griffith and Raymond Walton, Assistant County Attorneys, for appellee State.

Heard by Danilson, C.J., and Vogel and Vaitheswaran, JJ.

**DANILSON, C.J.**

David Willock appeals from the denial of his application for postconviction relief. To establish an ineffective-assistance-of-counsel claim, a claimant must prove by a preponderance of the evidence (1) his counsel failed to perform an essential duty and (2) prejudice resulted. Willock has failed to prove his various claims of ineffective assistance. We therefore affirm the denial of his application for postconviction relief.

### I. Background Facts and Proceedings.

*Criminal proceedings.* The following facts were summarized in former appeals from Willock's convictions of first-degree kidnapping, first-degree burglary, and first-degree robbery:

> Shortly after midnight on October 16, 2002, [S.S.] awoke when she heard a loud noise in her Waterloo home. Three men with guns came into her bedroom. They were wearing dark clothing, ski masks with "the eye and the mouth hole," and gloves. One of the intruders was around six feet tall, "a lot larger, broader shoulders, lighter comple[xion], bigger lips." The other intruders were shorter, "one quite small" and "then one an average build, but skinnier."
> 　　The intruders asked [S.S.] if there was anyone else in the house. She told them her two children were home. They asked where the children were, and she pointed to her daughter's bedroom. The intruders used duct tape to restrain [S.S.]'s children and left them upstairs. They then duct-taped [S.S.]'s mouth, hands, and ankles and carried her downstairs to the living room. The largest intruder watched [S.S.] while the other two went upstairs and ransacked her belongings. The two men came back downstairs and began yelling at her, "Where is it?"[1] They told her that she "better get" two men named Lamont Horton and Alonzo Quinn to come to her house.
> 　　Horton was [S.S.]'s former boyfriend. He had been at her residence the night prior to the incident. [S.S.]'s friend, Lindsay Bakken, was dating Quinn. Horton and Quinn were drug dealers. The intruders told [S.S.] that they were at her residence because Horton and Quinn had sold them bad drugs.

---

[1] The police discovered a large quantity of cocaine at [S.S]'s residence the next morning.

[S.S.] told the men that Quinn was at Bakken's nearby residence and gave them the address. She also gave them Horton's telephone number, and they attempted to call him from her house phone. They became upset when Horton did not answer, so [S.S.] convinced them to let her call Horton and leave him a message. Before she called Horton, she heard one of the intruders in the kitchen drinking something from her refrigerator. She asked for a glass of water, and one of the intruders brought her some in a Mickey Mouse mug.

When Horton did not respond to the message [S.S.] left for him, the men beat and sexually assaulted her. They left her residence with cash, a leather computer bag, and jewelry. One of them returned briefly and asked for directions to Bakken's house. After he left, [S.S.] freed herself and called the police.

Detective Scott Lake interviewed [S.S.] immediately following the incident. She gave the detective a physical description of each of the intruders, but she did not tell him that she recognized any of them. However, later that same day, [S.S.] told her uncle, brother, and Bakken that she believed one of the intruders was Willock. She told Bakken, "You know, I might have been through a big ordeal, but I just swear to you it sounded just like Dave's voice."

[S.S.] knew Willock because Bakken was dating him. Bakken had brought Willock to [S.S.]'s house on October 5, 2002. [S.S.] gave Willock a tour of her home while Bakken finished getting ready.

DNA testing was performed on the water jug present in [S.S.]'s refrigerator on October 16 and the Mickey Mouse mug she used to drink out of during the incident. Willock's DNA was present on both.

*State v. Willock*, No. 07-1200, 2008 WL 783372, at *1-2 (Iowa Ct. App. Mar. 26, 2008) (*Willock III*).

David Willock lived in the same house as his brother, Richard. Muscatine law enforcement authorities obtained a search warrant for the house to investigate possible identity theft by Richard. The warrant listed "notes, receipts, ledgers, [and] documents" relating to the person whose identity was claimed to have been stolen and relating to the fraudulent purchase of a vehicle in that person's name. The warrant made no mention of the crimes for which David Willock was being investigated. However, Muscatine authorities knew of that investigation and invited Waterloo and Cedar Falls police to assist with the search.

During the search, a Waterloo detective found a Wal-Mart receipt showing purchases of duct tape and ski masks. The receipt

was in the bedroom of Richard Willock. The receipt was photographed, and a copy of the photograph was admitted at [David Willock's] trial. This evidence became the subject of David Willock's motions to suppress.[2]

*State v. Willock*, No. 06-0343, 2007 WL 750646, at *1 (Iowa Ct. App. Mar. 17, 2007) (*Willock II*).

Willock was charged with first-degree kidnapping, first-degree burglary, and first-degree robbery in connection with the October 16, 2002 events.[3] Following a retrial related to the October 16, 2002 events, a jury found Willock guilty as charged. Willock appealed, challenging the district court's rulings on (1) his motion for new trial, (2) his motions to suppress, (3) his hearsay objections, (4) his objection to the details of a witness's prior conviction, (5) a jury instruction, and (6) the sufficiency of the evidence. *Willock II*, 2007 WL 750646, at *1.

With respect to the denial of his motion to suppress, Willock argued the warrant held by Muscatine police for the search of Richard Willock's house was "mere subterfuge used by Cedar Falls and Waterloo law enforcement to avoid the warrant requirement" to search for evidence related to charges against David Willock. *Id.* at *2. Noting that the seizure of an object found in plain view is justified where (1) the intrusion of the police was lawful and (2) the incriminating

---

[2] Guns were also found, but Willock's counsel advised the court considering his first suppression motion that he did not intend to challenge the admission of photographs of the guns.

[3] Willock was also charged with second-degree kidnapping, first-degree burglary, and first-degree robbery for an incident that occurred on October 26, 2002, involving two different victims. All of the charges were tried together at his first jury trial. *See State v. Willock*, No. 03–1944, 2004 WL 2951988, at *1 (Iowa Ct. App. Dec. 22, 2004) (*Willock I*). Following a jury trial, he was found guilty of all the charges, but on appeal we reversed the judgment and sentences and remanded for new trials, concluding the charges stemming from the October 16 incident should have been severed from the charges for the October 26 incident. *Id.*

nature of the object was immediately apparent, we upheld the denial of the motion to suppress. *Id.* (citing *Horton v. California*, 496 U.S. 128, 136 (1990); *State v. Chrisman*, 514 N.W.2d 57, 60 (Iowa 1994)). We also rejected Willock's challenges to asserted hearsay and other evidentiary rulings, *id.* at *3-4; found substantial evidence to support the removal alternative of kidnapping, *id.* at *5; and concluded there was sufficient evidence to prove confinement independent of the underlying crimes. *Id.* However, we conditionally affirmed Willock's convictions, *id.* at *6, remanding for consideration of his new trial motion based on the weight of the evidence (which the trial court had not considered). *Id.* at *1.

On remand, the district court rejected the motion for new trial, and we affirmed on appeal. *Willock III*, 2008 WL 783372, at *4. We summarized the district court's reasoning:

> Upon reviewing the evidence and considering the credibility of the witness, the district court found a greater amount of credible evidence supported the guilty verdicts. The court noted that [S.S.] told three individuals less than four hours after the attack that Willock was "one of the three black masked men who broke into her home." Two of those individuals testified at trial. Although [S.S.] initially told Detective Lake that Willock was not one of the intruders, she later told him Willock's eyes, skin color, voice, and lips made her think that he could have been one of the attackers. The district court also noted that, as evidenced by the Wal–Mart receipt, Willock's brother, Richard, "purchased duct tape and ski masks on the date of this event and duct tape and ski masks were used in the commission of this crime." The court concluded the receipt therefore established that Willock "had access to these items or similar items."
> The district court determined "[t]he DNA evidence is really what seals Mr. Willock's fate." DNA testing revealed that Willock's DNA was present on both the water jug and the Mickey Mouse mug. Although Willock claimed he drank some water from a water jug in [S.S.'s] refrigerator while he was at her house on October 5, 2002, [S.S.] and Bakken both testified they were with Willock the entire time he was there and he did not go into the kitchen to get something to drink. Furthermore, the State introduced evidence

that indicated [S.S.] most likely purchased that jug of water on October 9, 2002, four days after Willock was present in her home with Bakken.

The opposing evidence cited by Willock simply does not preponderate heavily against the verdict. The district court considered and rejected his arguments regarding this evidence, finding the jury could have reasonably reached different conclusions from the evidence.

*Id.* at *3.

*Postconviction proceedings.* Willock thereafter filed an application for postconviction relief, raising five claims of ineffective assistance of his criminal trial counsel. He asserted trial and appellate counsel failed to (1) effectively challenge the search warrant, (2) effectively challenge the evidence obtained by the search, (3) request a spoliation instruction concerning an unavailable recording of a witness interview, (4) move in limine to exclude S.S.'s in-court identification of Willock, and (5) effectively object to improper opinion testimony by Detective Lake. Willock filed a motion for summary disposition, which the postconviction court denied.

Willock submitted "uncontested facts," including,

6. [Officer] Schwarz allowed the Waterloo and Cedar Falls officers to search the bedroom of Applicant wherein Applicant plainly did not share the bedroom with his brother or Cooks.

7. Officers took a photograph of a handgun that was allegedly located under the pillow on Applicant's bed. That photo and testimony explaining it were subsequently admitted in evidence before the jury.

8. Officers located a receipt from a store in Applicant's brother's bedroom. That receipt was photographed and later linked to the purchase of duct tape and stocking caps with mask holes from a store in Iowa City. A photograph of that receipt and the explanation of the items on it were later admitted in evidence before the jury. Applicant's brother testified before the jury to explain the receipt.

9. Applicant's trial and appeal attorneys did not frame the Motion to Suppress the Evidence to assert the Search Warrant was

obtained upon fraud by concealment and reckless disregard for the facts in the Application for Search Warrant.

10. Trial and appeal counsel never asserted the photos and resulting testimony on the gun and receipt should have been excluded from evidence before the jury as the evidence was not relevant and clearly more unfairly prejudicial than probative.

. . . .

13. On October 21, 2002, Investigator Lake again spoke with the victim and asked her specifically about Applicant David Willock. She described events in Waterloo and Iowa City, and in-transit in between the two cities, when she spent a considerable amount of time with Applicant David Willock. In the same interview, she told Investigator Lake "she was sure David was not one of the intruders." "She said David was very well built with big arms." This October 21 interview is recorded in a report Investigator Lake completed October 23, 2002. (Ex. "B").

14. On October 31, 2002, Lake and Investigator Krantz conducted an interview with Applicant Willock at the Iowa City Police Department. At that time, Applicant Willock told the investigators he lived at 1155 Weeber Street, in Iowa City. Applicant told police his brother, Richard, owned the house and other people living there were Jeff Cooks, Edwon Simmons, and Luther Hammett. Applicant also verified nicknames of Cooks and Hammett for the officers. This information is included in the report Lake prepared on November 5, 2002. (Ex. "C").

At the postconviction hearing, Detective Lake testified he believed that the interview rooms at the police station in 2003 were equipped to record once the room was entered, but in 2002 there was a choice to turn it on or leave it off. He testified that "know[ing] my habits," "I would have recorded an interview like" the October 21, 2002 interview with S.S. (when S.S. stated she was sure that David Willock was not among the intruders in her house). He repeated, "There is no way that I would not have recorded that interview. That's going to be my answer to you on that. No way. I'm positive that interview was recorded. Whether something happened technically, I can't answer that, and I don't remember that." However, Lake's report of the interview did not indicate it was recorded and no recording of the interview was ever provided.

Willock's criminal trial attorney, John Bishop, testified he was co-counsel with attorney John Lane during Willock's 2003 trial. Bishop was also defense counsel on direct appeal, and with Jill Ableidinger represented Willock during his 2005 trial. Bishop testified there had been a challenge to the search of the house prior to the second trial and he had found a federal case he thought helpful.[4] Bishop testified he thought they had moved to suppress the marijuana found during the search.[5] He also testified he did not move to suppress the pictures of the guns found during the search of the house because he believed they would be found relevant and probative, though moving to suppress on grounds they were unfairly prejudicial "couldn't have hurt David."

The district court carefully analyzed and rejected each of Willock's claims of ineffective assistance of counsel. The court concluded,

> In addition to considering Willock's claims individually, the court has considered the aggregate effect of what errors trial counsel did make and finds that, given the strength of the other evidence, including [S.S.'s] identification of Willock and the DNA testing results, Willock has failed to demonstrate that absent all of his attorneys' errors, there is a reasonable probability that the outcome of the trial would have been different. Willock is not entitled to postconviction relief.

Willock appeals.

---

[4] The record from the second trial indicates Bishop challenged the search of David Willock's room on grounds it was a warrantless search, noting the warrant executed was for the residence of Richard Willock. Bishop had relied upon *State v. Sanchez*, 509 F.2d 886 (6th Cir. 1975), which invalidated the seizure of explosives by federal agents who were assisting during the execution of a warrant issued to state law enforcement for the search of narcotics. The trial court rejected that argument as no longer controlling authority, citing *United States v. Johnson*, 707 F.2d 317, 320-211 (8th Cir. 1983) (rejecting subterfuge claim where the evidence was found in plain view during a search pursuant to a valid search warrant). *Cf. Horton v. California*, 496 U.S. 128, 136-37 (1990) (concluding item found in plain view during warrantless search need not have been found "inadvertently").

[5] There was no motion suppress the marijuana filed before the retrial.

**II. Scope and Standard of Review.**

We review claims of ineffective assistance of counsel de novo. *State v. Lyman*, 776 N.W.2d 865, 877 (Iowa 2010). We give weight to the district court's findings concerning witness credibility, but are not bound by them. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

**III. Discussion.**

"Ineffective-assistance-of-counsel claims have their basis in the Sixth Amendment to the United States Constitution." *State v. Vance*, 790 N.W.2d 775, 785 (Iowa 2010). To establish an ineffective-assistance-of-counsel claim, a claimant must prove by a preponderance of the evidence "(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). "The claimant must prove both elements by a preponderance of the evidence." *State v. Madsen*, 813 N.W.2d 714, 724 (Iowa 2012).

> To satisfy the first prong of the *Strickland* test, [the claimant] must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. In evaluating the objective reasonableness of trial counsel's conduct, we examine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. We evaluate the attorney's performance against "'prevailing professional norms.'" *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001) (quoting *Strickland*, 466 U.S. at 688).

*Madsen*, 813 N.W.2d at 724.

As already noted, the claimant must also establish counsel's deficient performance prejudiced him. *Straw*, 709 N.W.2d at 133. "[I]f a claimant raises

multiple claims of ineffective assistance of counsel, the cumulative prejudice from those individual claims should be properly assessed under the prejudice prong of *Strickland*. The court should look at the cumulative effect of the prejudice arising from all the claims." *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012). Prejudice exists if "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Graves*, 668 N.W.2d 860, 882 (Iowa 2003) (quoting *Strickland*, 466 U.S. at 694). A "reasonable probability" means "[t]he likelihood of a different result need not be more probable than not, but it must be substantial, not just conceivable." *King v. State*, 797 N.W.2d 565, 572 (Iowa 2011). Counsel's errors must "undermine our confidence in the verdict." *Id.* at 575.

We address each of Willock's claims in turn.

*A. Inadequate challenge to the search warrant.* Willock first contends the trial and appellate counsel failed to move to suppress based upon a claim that the search warrant was obtained by fraud or misrepresentation when the detective who applied for the search warrant did not inform the issuing magistrate that three individuals, including David Willock, resided at the residence sought to be searched in addition to Richard Willock and Jeff Cooks. The postconviction court rejected this argument, finding Willock had failed to demonstrate he was entitled to a *Franks* hearing[6] and thus counsel did not breach an essential duty. We find no reason to disturb this ruling.

---

[6] *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the United States Supreme Court ruled:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless

The facts Willock asserts were omitted do not cast doubt on the existence of probable cause regarding the Muscatine County investigation of identity theft. The record indicates Detective Matthew Schwartz of the Muscatine Police Department was investigating Richard Willock and Jeff Cooks for identity theft. There is no evidence that Detective Schwartz pursued the search warrant under the pretext of the identity theft allegations with the purpose of circumventing the lack of probable cause to execute a warrant related to allegations against David Willock.

In any event, the argument appears to be a reworking of the claim counsel *did* make on direct appeal—that the search warrant was obtained by subterfuge. *See Willock II*, 2007 WL 750646, at *2. The present claim is a collateral attack on that ruling, which we do not address. *See* Iowa Code § 822.8 ("Any ground finally adjudicated . . . in any other proceeding the applicant has taken to secure

---

disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155-56.

"The *Franks* doctrine has been applied to situations involving the omission of crucial information from a warrant application as well as the inclusion of inaccurate information." *State v. Poulin*, 620 N.W.2d 287, 289 (Iowa 2000). "When such omissions are established, a court reviewing a magistrate's finding may determine the probable-cause issue by considering both the information contained in the warrant application and the omitted information deemed to be significant." *Id.*

relief, may not be the basis for a subsequent application [for postconviction relief.]").

Finally, relying on our supreme court's holding in *State v. Fleming*, 790 N.W.2d 560, 564-65 (Iowa 2010), Willock contends trial and appellate counsel were ineffective in failing to move to suppress evidence found during the search[7] as being outside the scope of the warrant.

In *Fleming*, the defendant on appeal argued the district court erred in overruling his motion to suppress, contending that when officers obtain a search warrant for a single-family residence they must obtain a separate warrant to search a rented room located therein. 790 N.W.2d at 561-62. Our supreme court held for the first time:

> Generally, when single, unrelated persons live together in a house, the kitchen, living room, bathroom, hallways and entryways are communal space, but the individual bedrooms remain private. As a social norm, this is fairly well established; thus, many of these individuals probably do not feel the need to clearly delineate their personal space with locks or signs. We find a reasonable expectation of privacy in an individual room rented within a single-family house.

*Fleming*, 790 N.W.2d at 567. The court then found Fleming had demonstrated a legitimate expectation of privacy in his bedroom because "Fleming rented a room within Nearman's house for $375 a month. He was not related to Nearman and testified that he had exclusive possession and control of his room. There is no indication he gave Nearman access to his private bedroom." *Id.* While there had been a warrant issued to search Nearman's house for drugs, the court observed

---

[7] Specifically, he argues counsel should have moved to suppress the marijuana found in David's bedroom, the photographs of David's handgun and the receipts for handguns found in David's bedroom, a photo of a handgun found in another bedroom in the house (Hammett's), and the photo of the Wal-Mart receipt found in Richard's bedroom.

that the application named only Nearman as having possession of drugs, "there was no showing of probable cause to search Fleming's room. Therefore, the search of his room was warrantless." *Id.* at 568. Because there was no showing an exception existed to justify the warrantless search of Fleming's room, the court concluded the evidence seized from Fleming's room during the search had to be excluded on retrial. *Id.* at 569.

Here, Willock presented the 2011 affidavit of his brother Richard, in which he avers David was a tenant who paid rent of $400 per month to live at the residence; each tenant had his own bedroom, which could be locked with a key; and Richard was not authorized to enter David's bedroom without David's permission. A photograph of a handgun and marijuana found in David's room were introduced at trial.

The postconviction court ruled that because the legal issue was unsettled at the time of Willock's 2005 trial, trial counsel did have a duty to assert that "searching Willock's bedroom was outside the scope of the warrant to search 1155 Weeber, requiring a separate warrant for Willock's bedroom." *See Millam v. State*, 745 N.W.2d 719, 723 (Iowa 2008) ("[T]he test to determine whether counsel is required to raise an issue is whether a normally competent attorney would have concluded that the question was not worth raising." *Graves*, 668 N.W.2d at 881 [(citations, alterations, and quotation marks omitted)]. This test does not require an attorney to be clairvoyant, but rather to research the relevant legal issues and determine whether, given the circumstances of the particular case, the issue is "worth raising."). We need not rule on whether counsel failed in an essential duty in not asserting the theory recognized in *Fleming* to support a

motion to suppress. Even assuming the current claim can be distinguished from the claim made on direct appeal, and that the officer deliberately omitted facts or did so with reckless disregard, Willock's claim fails. Counsel had no duty to raise the issue successfully raised in the 2010 *Fleming* case because Willock has not established he was prejudiced by the failure to file a motion to suppress on *Fleming* grounds.

As noted by the postconviction court, Willock failed to establish he was prejudiced because (1) it was not clear that the motion would have been successful (noting the *Fleming* court's repeated reliance upon the lack of familial relationship between Fleming and the owner of the house) and (2) even if the motion to suppress evidence found in his bedroom had been successful, Willock failed to establish the outcome of the trial would have been different. We reach this conclusion because although the evidence from Willock's bedroom may have been suppressed, Willock had no standing to challenge the items found in the other bedrooms. Consequently, the Wal-mart receipt showing the purchase of duct tape and ski masks hours before the home invasion would still have been admitted. At best, Willock could have suppressed all evidence of a handgun or knowledge of a handgun in the house. The outcome of the trial would not have changed as the State still had evidence of S.S.'s identification of Willock as one of the intruders, Willock's DNA from S.S.'s water container, and the Wal-Mart receipt.

*B. Inadequate challenge to the evidence obtained by the search.* Willock argues "[t]he various and separate items taken in the search of Richard's house have no evidentiary link to the crimes perpetrated upon S.S." He maintains the

cumulative effect of the evidence obtained from the search of Richard's house constituted improper character evidence, which trial counsel should have sought to have excluded.

The postconviction court rejected this claim, summarizing:

The photograph of the Wal-Mart receipt, the photograph of Willock's bedroom, the photograph of the firearm found in his bedroom, the photograph of his safe, the photographs of the firearms receipts, and the photograph of the firearm found upstairs had significant probative value. The Wal-Mart receipt linked Willock to the purchase of duct tape and ski masks. The intruders who entered [S.S.'s] home wore ski masks and used duct tape to restrain [S.S.] and her children. The photographs related to the firearms established that Willock had access to a firearm. The intruders were armed with handguns.

On October 16, 2002, S.S.'s home was invaded by three masked intruders bearing guns, who complained S.S.'s boyfriend Horton had sold them bad drugs—they used duct tape to bind S.S. and her children. We agree the Wal-Mart receipt indicating ski masks and duct tape were purchased the day before the home invasion, which was found in the house where Willock lived, was relevant and highly probative evidence.

S.S. testified David Willock was one of the armed intruders. She had met him prior to the night of the invasion because he was seeing S.S.'s friend, Lindsay Bakken, and he had been in S.S.'s residence on October 5 and asked for a tour. The evidence presented at trial was that the intruders were looking for Horton and Quinn because they sold them bad drugs. Bakken testified at the criminal trial that Quinn and Horton sold marijuana and cocaine. Bakken also testified Willock knew Horton and Quinn. With this background and in connection with the Wal-Mart receipt, a motion to exclude the marijuana and the guns found

in the same house would not have been successful on grounds it was irrelevant. *See* Iowa Rs. Evid. 5.401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."), 5.402 ("All relevant evidence is admissible except as otherwise provided . . . .").

Willock complains the evidence raises the implication "the armed men living in Richard's house were a dangerous drug dealing enterprise." He argues counsel should have sought to exclude it as unfairly prejudicial. *See* Iowa R. Evid. 5.403 (allowing exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice"). Exclusion of relevant evidence "is required only when evidence is *unfairly* prejudicial [in a way that] substantially outweighs its probative value. 'Unfair prejudice' is the undue tendency to suggest decisions on an improper basis, commonly though not necessarily, an emotional one." *State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013) (citations and internal quotation marks omitted).

For Willock to successfully prove counsel was ineffective in failing to move to exclude gun and drug evidence found during the search, he would have to show exclusion was required. *See id.* at 536 (Iowa 2013) (noting "[w]e reverse a ruling that the district court makes in the balancing process under rule [5.403] only if the district court has abused its discretion"). We cannot say a trial court presented with a motion to exclude the evidence would have abused its discretion in overruling such a motion. S.S. identified Willock as one of the armed intruders who entered her home on October 16, 2002, seeking a man who

had sold them bad drugs. Willock's DNA was found in a water jug at S.S.'s home. The receipt for the October 15, 2002 purchase of duct tape and ski masks, as well as guns found in Willock's residence were highly probative of Willock's participation.[8] The men who broke into S.S.'s home announced their motive was drug related, and the introduction of marijuana found during the search of the house in which Willock lived was not unduly prejudicial. This claim of ineffective assistance of counsel fails.

*C. Failure to request a spoliation instruction concerning an unavailable recording of interview of S.S.* Willock contends there was a recording of the October 21, 2002 interview of S.S. in which she states she is sure Willock was not one of the intruders. He claims its absence is purposeful—that "Lake intentionally did away with S.S.'s tape exonerating David." He maintains trial counsel should have requested a spoliation instruction. We are not convinced.

> A spoliation instruction is "a direction to the jury that it [may] infer from the State's failure to preserve [evidence] that the evidence would have been adverse to the State." The definitive Iowa case on a defendant's entitlement to a spoliation instruction based on the government's destruction of evidence is *State v. Langlet*, 283 N.W.2d 330 (Iowa 1979). In that case this court noted the general principle that when evidence is intentionally destroyed, "the fact finder may draw the inference that the evidence destroyed was unfavorable to the party responsible for its spoliation." This inference is based on the rationale that a party's destruction of evidence is "an admission by conduct of the weakness of [that party's] case." Accordingly, "the spoliation inference is not appropriate when the destruction is not intentional."

---

[8] Willock points out that there is no evidence the duct tape and ski masks purchased were used in the home invasion. But there was evidence that the type of duct tape purchased was one of two that were used. The receipt and guns found during the search tended to show Willock had access to the types of items used during the invasion. "Direct and circumstantial evidence are equally probative." Iowa R. App. P. 6.904(3)(p).

> We held in *Langlet* there must be substantial evidence to support the following facts in order to justify a spoliation inference: (1) the evidence was "in existence"; (2) the evidence was "in the possession of or under control of the party" charged with its destruction; (3) the evidence "would have been admissible at trial"; and (4) "the party responsible for its destruction did so intentionally." Before instructing the jury on the inference, the trial court must make a threshold determination that the foundation for the inference is sufficient, in other words, that "'a jury could appropriately deduce from the underlying circumstances the adverse fact sought to be inferred.'"

*State v. Hartsfield*, 681 N.W.2d 626, 630 (Iowa 2004) (citations omitted).

We acknowledge Detective Lake testified at the postconviction hearing that he would have recorded the interview with S.S. on October 21, 2002. But his report of that interview does not state the interview was recorded, and Willock has presented no evidence there was in fact a recording made of the October 21, 2002 interview.[9] Because a spoliation instruction requires a showing that the missing evidence was "in existence," a motion for spoliation instruction would not have been granted. *See id.*

In any event, Detective Lake testified at the criminal trial that S.S. did state on October 21, 2002, that Willock was *not* one of the intruders. S.S. acknowledged at trial that she had told Detective Lake at one point that Willock was not involved.

*D. Failure to move in limine to exclude S.S.'s in-court identification of Willock.* Willock next contends trial counsel was ineffective in failing to exclude S.S. from making an in-court identification of Willock because it was contrary to her October 21, 2002 "exoneration" and "wholly unbelievable." At trial, S.S.

---

[9] The county attorney indicated a recording could never be located or found to be in existence.

identified Willock as "definitely" one of the intruders. She testified she had told Detective Lake at one point that Willock was not involved "because I didn't know who to trust at the time." Bakken testified S.S. told her on October 16, "I don't know why I get this feeling, but I feel that David was there." S.S.'s uncle testified that the morning following the break-in S.S. stated "David from Iowa City" had been involved and "said she recognized his tone of voice, his mannerisms and build and structure."

We agree with the postconviction court that "[u]nder the circumstances, [S.S.'s] credibility and the reliability of her in-court identification of Willock and her out-of-court statements to Williams and Bakken that identified Willock were for the jury to weigh." *See State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (noting it is the province of the jury to resolve conflicts of evidence to and to pass on the credibility of witnesses, determine the plausibility of explanations, and weigh the evidence). Any motion to exclude S.S.'s identification would not have been successful, and therefore Willock cannot establish counsel's performance was deficient.

*E. Failure to effectively object to improper opinion testimony by Detective Lake.* Finally, Willock contends trial counsel was ineffective in failing to object to improper opinion testimony.

"We have permitted an expert witness to testify regarding the 'typical symptoms exhibited by a person after being traumatized.'" *State v. Dudley*, ___ N.W.2d ___, 2014 WL 6851441, at *6 (Iowa 2014) (quoting *State v. Gettier*, 438 N.W.2d 1, 6 (Iowa 1989)). In addressing opinion testimony of an expert witness in a child sex abuse case, our supreme court stated:

> Although we are committed to the liberal view on the admission of psychological evidence, we continue to hold expert testimony is not admissible merely to bolster credibility. *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992). Our system of justice vests the jury with the function of evaluating a witness's credibility. *Id.* The reason for not allowing this testimony is that a witness's credibility "is not a 'fact in issue' subject to expert opinion." *Id.* (quoting *State v. Myers*, 382 N.W.2d 91, 97 (Iowa 1986)). Such opinions not only replace the jury's function in determining credibility, but the jury can employ this type of testimony as a direct comment on defendant's guilt or innocence. *Id.* Moreover, when an expert comments, directly or indirectly, on a witness's credibility, the expert is giving his or her scientific certainty stamp of approval on the testimony even though an expert cannot accurately opine when a witness is telling the truth. In our system of justice, it is the jury's function to determine the credibility of a witness. An abuse of discretion occurs when a court allows such testimony. *Id.*

*Id.*, 2014 WL 6851441, at *6.

When a claim of improper opinion testimony is raised in an ineffective-assistance-of-counsel claim, the claimant must not only establish counsel failed to properly object to the testimony, but that prejudice resulted. *See id.* at *8 (citing *In re Det. of Blaise*, 830 N.W.2d 310, 320–21 (Iowa 2013) (noting in an ineffective-assistance-of-counsel claim the burden is on the defendant to show prejudice)).

Willock contends the postconviction court erred in concluding improper opinion testimony did not result in prejudice.[10] The postconviction court found two statements made by Detective Lake at trial constituted objectionable opinion testimony. The first came in after an objection by trial counsel: Detective Lake was asked,

---

[10] Willock does not specify what statements he finds objectionable but does direct us to the district court's ruling. This is barely sufficient to bring the issue to this court's attention.

Now, with regard to assault like this where you have three masked men and the use of firearms and the other things connected with this, tell us what your [twenty-one years of] experience is with regard to how quickly people are willing to say this is the person that did this to me or I think this is the person that did this to me?

The court instructed the jury to keep in mind that the answer would be an opinion and it would be for them to make the assessment as to all of the facts, "including this item of testimony." Detective Lake answered,

I guess my best answer to that or opinion to that would be in general terms when a person is subjected to something traumatic, as what happened here, I think that it's one thing for that victim to tell people close to her suspicions they had about who may have done it, family or friends, but when it comes to telling law enforcement, somebody that they know is going to go confront that person with what the victim has said, I think that's another thing, and I think that raises fear in people's minds as to the repercussions, especially specifically in this case, as to the type of assault and the injury and the seriousness of what happened to her on this morning.

The second statement made by Detective Lake about which Willock complains came in at trial without objection—he was asked whether, in his experience, people are generally willing to accuse other people of crimes if they are not positively sure about the person's involvement; his response was, "No."

We are not convinced either statement by Detective Lake provides any information other than common sense or information known to jurors from their common experiences. People commonly confide in their family and friends about important affairs and generally, people do not make accusations unless they know whom to accuse. However, we need not decide whether either or both responses were improper opinion testimony because, upon our de novo review,

we agree with the postconviction court that Willock has not established prejudice resulted. We affirm the postconviction court's reasoning:

> Willock has failed to establish that excluding Lake's testimony on these matters likely would have changed the outcome of the trial. Lake's speculation about [S.S.'s] state of mind was cumulative of other properly admitted evidence. [S.S.'s] uncle, Adam Williams, had already testified that on October 16, 2002, [S.S.] told him that she thought "it might be this guy from Iowa City named David" who had done this to her and that she had not told the police about David in Iowa City because "she was scared. She was very scared. She stated to me she was in fear of her life and the lives of her children . . . ." The statements that [S.S.] made to Williams were offered to explain Williams' own conduct—why he relayed this information to John Daws of the Waterloo Police Department on October 17, 2002, with the understanding that his identity as the reporting party would be confidential. Additionally, [S.S.'s] statements to Williams were properly admitted as hearsay exceptions pursuant to Iowa R. Evid. 5.803(3). They were statements of [S.S.'s] then existing state of mind, emotion, or physical condition.
>
> Lake's testimony as to the truthfulness of [S.S.'s] identification of Willock was brief, not extensive. Both [S.S.] and Lake were cross-examined at length about the facts that [S.S.] initially did not identify Willock as one of the intruders and at one time positively excluded him as one of them. In argument, one of the defense's focuses was [S.S.'s] lack of credibility and the unreliability of statements she made both under oath and not under oath.

In light of the facts that S.S. had already testified she did not identify Willock earlier because she did not know who to trust, and that the objectionable testimony was relatively brief, we agree Willock did not prove "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Graves*, 668 N.W.2d at 882. Moreover, the State's case did not rest entirely on S.S.'s identification of Willock; Willock's involvement is implicated by his DNA found on a cup and jug found in S.S.'s residence and by the Walmart receipt found in Willock's residence. *Cf.*

*State v. Brown*, ___ N.W.2d ___, 2014 WL 6851443, at *4 (Iowa 2014) (finding admission of opinion testimony prejudicial because the "State's entire case depends on the credibility" of child complainant).

**IV. Conclusion.**

Willock has not proved counsel was ineffective, and we therefore affirm the denial of his application for postconviction relief.

**AFFIRMED.**