# IN THE COURT OF APPEALS OF IOWA

No. 21-1612
Filed July 26, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**KYLE ROBERT MALL,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Benton County, Justin A. Lightfoot, Judge.

        A defendant appeals his convictions of two counts each of second-degree sexual abuse, lascivious acts with a child, and assault with intent to commit sexual abuse.  **AFFIRMED.**

        R. Ben Stone of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer, LLP, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

        Heard by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

A jury convicted Kyle Mall on two counts each of second-degree sexual abuse, lascivious acts with a child, and assault with intent to commit sexual abuse. He alleges seven errors: (1) the district court allowed vouching; (2) the prosecutor engaged in misconduct; (3) the court allowed the jury to consider his statements that were induced by promises of leniency or were otherwise involuntary; (4) the court rejected his request for a "taint hearing" and found the children competent to testify; (5) insufficient evidence supported the verdicts; (6) the court denied his request for mistrial after mid-trial delays; and (7) cumulative error violated his right to a fair trial. We find no abuse of discretion or legal error and consequently no cumulative error, so we affirm.

## I. Facts and Prior Proceedings

In March 2020, Mall lived with his wife, Sunnie, and their four-year-old twins, daughter E.M. and son C.M. One Saturday, Sunnie heard E.M. say "Dad makes me do things in the shower." Sunnie didn't tell her husband. But on Monday, after he left for work, she asked each twin separately about the comment: "[A]ll I said was, 'Tell me about what you do with Dad in the shower.' And they both said, 'Dad makes us suck his wiener.' [C.M.] said, 'Dad sucks my wiener too. It feels good.'"

Later that day, Sunnie confronted Mall about what the twins said. Mall denied anything happened in the shower. But on Tuesday, Sunnie called the Iowa Department of Health and Human Services[1] (DHS). The DHS directed the children

---

[1] Recent legislation combined two agencies into the Iowa Department of Health and Human Services. But at all times during these proceedings, it was the Iowa Department of Human Services, so we will continue to use the acronym DHS.

to a child protection center (CPC) where forensic interviewer Rachel Haskins spoke to them individually. Both children disclosed that, while showering or bathing together, Mall urged them to "suck" his "wiener." C.M. disclosed that Mall also "sucks my wiener" in the shower.

After the children's interviews, DHS investigator Bethany Hosch and Belle Plaine Police Chief Kristopher Hudson contacted Mall. Hosch asked Mall if he was available to discuss the allegations. Mall agreed to meet at the Benton County Sheriff's Department. When he arrived, Hosch and Hudson took Mall to a secure interview room, where all three talked for about forty-five minutes. Mall denied engaging in sex acts with his children. After the interview, Mall left.

During the DHS investigation, Sunnie recounted an incident from the summer of 2019. She explained it was common for the children to shower with their father. That June, C.M. emerged from the bathroom wearing a towel. He came into the kitchen and "asked [E.M.] to suck his wiener," then he asked Sunnie "to suck his wiener." Sunnie spoke with the children separately. They said a child at their daycare may have "showed his wiener to the other kids." Sunnie alerted their daycare provider, who denied anything like that happened.

After assessing the children's statements and other evidence, the State charged Mall with two counts of sexual abuse in the second degree in violation of Iowa Code section 709.3(1)(b) (2020); two counts of lascivious acts with a child in violation of 709.8(1)(a)–(c); and two counts of assault with intent to commit sexual abuse in violation of Iowa Code section 709.11(3).

Before trial, Mall moved to suppress statements he made in his interview with Hosch and Hudson. He also challenged the competency of the twins to testify.

In addition, he requested a "taint hearing" to determine whether the twins' statements should be excluded because they were influenced by Sunnie or their therapist.  The court declined to hold a "taint hearing" but did engage with the children to determine that they were competent to testify.  The court also denied the motion to suppress.[2]

Over a seven-day trial, Sunnie and the twins testified for the State, along with Haskins, Hosch, Hudson, and the children's therapist, psychologist Dr. Jill Bryant.  The defense called Mall, Mall's father, and a rebuttal psychologist.  The jury found Mall guilty as charged.  He now appeals.

## II. Analysis

### A. Vouching

Mall first claims the district court allowed impermissible vouching by the prosecution and its expert witnesses, violating principles outlined in *State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014), *State v. Brown*, 856 N.W.2d 685, 687 (Iowa 2014), and *State v. Jaquez*, 856 N.W.2d 663, 664 (Iowa 2014).  We review those district court rulings for an abuse of discretion.  *Dudley*, 856 N.W.2d at 675.

*Dudley*, *Brown*, and *Jaquez* explore the contours of Iowa Rule of Evidence 5.702 in child sexual abuse prosecutions.  That rule permits expert opinion testimony if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Iowa R. Evid. 5.702.  So what's permitted?  Experts may "express opinions on matters that explain relevant mental and psychological symptoms present in sexually abused children."  *Dudley*, 856

---

[2] The court did not hold a hearing on the motion to suppress, instead deciding based on depositions given by Hudson and Hosch.

N.W.2d at 676 (quoting *State v. Myers*, 382 N.W.2d 91, 97 (Iowa 1986)). And what's prohibited? Experts may not provide testimony that either directly or indirectly renders an opinion on the credibility of a witness. *Id.* Such testimony usurps the jury's role by providing a "scientific stamp of approval" to testimony even though the expert cannot determine when a witness is telling the truth. *Id.* at 677.

Mall focuses on the moment when Dr. Bryant testified that during intake E.M. and C.M. were "a little wild" and "running around" her office but that they "seemed honest," despite being "not interested in talking." The State concedes that this statement constituted vouching. It was not the kind of testimony that helped the jury understand behavioral trends in victims of sexual abuse. *Id.* at 676. Rather, Dr. Bryant's statement that these children "seemed honest" commandeered the role of the jury to make credibility assessments.

But this case was unlike *Dudley*, *Brown*, and *Jaquez*—where the district courts allowed the problematic testimony. Here, the court sustained objections to Dr. Bryant's comment and instructed the jury to disregard it. The court properly exercised its discretion in addressing the expert's testimony that vouched for the honesty of the twins.

Mall next relitigates his motion for mistrial.[3] In denying that motion, the court reasoned that the expert's vouching was isolated and stricken from the record.

---

[3] The State challenges error preservation, arguing Mall did not move for a mistrial when the grounds first became apparent. *See State v. Cornelius*, 293 N.W.2d 267, 269 (Iowa 1980). Mall moved for mistrial a day after Dr. Bryant testified. The State did not object to the motion as untimely. *See DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002) ("Because error preservation is based on fairness, we think *both* parties should be bound by the rule."). Because the delay was not great and the district court ruled on the issue, we find that Mall preserved error for appeal.

It was a single statement and was not extensive. It was promptly addressed. The jury was told to disregard it. In fact, we never heard what the kids actually said to her that she thought was true. She never testified as to what the kids said. . . . [H]er testimony really didn't move the needle in this case. She really didn't testify to much that I can see from my notes.

Because the court's rationale was supported by the record and legally sound, we find no abuse of discretion.

But Mall doesn't stop there. He chronicles ten more instances of alleged vouching that he claims violated his right to a fair trial under *Dudley*. First, he points to this passage from the State's opening statement: "These are good kids. In fact, they're great kids. . . . [T]hey're everything that we hope and dream of in our young people in this country." Defense counsel objected. And the court directed the State to "go ahead and move along."

Because this statement came from the prosecutor and not an expert witness, it does not fall under the prohibitions in *Dudley* and its companion cases. Those cases sought to prevent experts from providing a "scientific stamp of approval" to victim testimony. *See Dudley*, 856 N.W.2d at 677. They did not address allegations of vouching by the State. We find this allegation is better analyzed under Mall's claim of prosecutorial misconduct. That same distinction applies to Mall's other vouching claims involving questions posed by the State which drew objections.[4] Because the court sustained Mall's objections, no vouching testimony reached the jury.

---

[4] Mall identified several other instances of the prosecutor's questions allegedly soliciting vouching testimony from lay witnesses: (1) The prosecutor asked Sunnie if she spoke with the prosecutor about whether to file charges against Mall; (2) The prosecutor asked C.M. on redirect if he "still promis[es] to tell the truth"; (3) The prosecutor asked Mall in cross-examination why C.M. would give such a detailed

In fact, Mall points us to just one example where the district court overruled his objection to expert testimony. Mall interjected when the State asked Haskin, the CPC interviewer, if she could "discuss whether or not it's common for children to not disclose sexual abuse right away." The court allowed Haskin to testify that "it's not uncommon for children to delay reporting." That statement did not constitute impermissible vouching. Experts are allowed to "express opinions on matters that explain relevant mental and psychological symptoms present in sexually abused children." *Id.* at 676. Delayed reporting is one such matter, and Haskin phrased her response in general terms.

Mall objected again when the State asked Haskin if "there [is] an expectation that a child disclosing child abuse or sex abuse will have the same story every time they talk about it?" The court sustained the objection based on the wording of the inquiry. The State rephrased its question, asking if it was "common for children to have different versions of their abuse when they retell . . . what happened to them at a later date?" Mall did not renew his objection. And Haskin responded: "Sometimes details will change between . . . who the child is telling. There will still be those consistent pieces of information, but sometimes things will change." Despite not objecting to the State's rephrasing, Mall argues on appeal that Haskin's response constituted impermissible vouching.

We disagree. The State's question related to the general behavior displayed by children who are victims of abuse, and Haskin offered no details to expand the question's scope. Haskin's response fell within the category of expert

---

report if it was false; and (4) The prosecutor again asked Mall if he agreed the children's reports were highly detailed.

testimony intended to "assist the jury in understanding some of the seemingly unusual behavior child victims tend to display." *See id.* at 675.

After analyzing the challenged statements, we conclude that Mall was not subjected to any instances of impermissible vouching. So the district court did not abuse its discretion in denying Mall's motion for mistrial.

**B. Prosecutorial Misconduct**

Mall next claims prosecutorial misconduct deprived him of a fair trial. The State contests error preservation. We begin by assessing whether Mall preserved his vouching challenges to the prosecutor's opening statement and questions to witnesses. As noted above, the district court sustained Mall's objections on each occasion. But Mall didn't move for a mistrial. Thus, he cannot obtain a new trial based on these instances of prosecutorial misconduct. *See State v. Krogmann*, 804 N.W.2d 518, 526 (Iowa 2011).

Mall also alleges the prosecutor engaged in misconduct by asking an argumentative question during his cross examination. The question focused on sexual abuse Mall's wife suffered as a child. As background, the State moved pretrial to exclude testimony on that topic. The district court denied the motion, believing Sunnie's abuse could be relevant. Still, the court recognized that the probative value of that evidence could be outweighed by the risk of unfair prejudice, so the court left the door open for the State to object at trial. And the prosecutor did lodge frequent objections during Mall's direct testimony. But the court overruled most of them.

Then, to begin its cross-examination, the State asked Mall: "[T]his is a fair statement, isn't it? You're willing, before this jury this week, to re-victimize your

wife's past sexual abuse in an attempt to get acquitted?" Mall objected that the question was argumentative, and the court sustained that objection. Mall did not move for mistrial or seek any other curative measure. So his sustained objection did not preserve his prosecutorial misconduct claim. *See id.* at 526. Thus, we decline to reach the merits of his appellate argument.

## C. Admissibility of Mall's Interview

Mall also seeks a new trial based on the admission of his video-recorded interview with DHS investigator Hosch and police chief Hudson. He raises three grounds for exclusion. First, he contends it was a custodial interrogation and they should have given him *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Second, he asserts Hosch and Hudson made promises of leniency in exchange for his confession—rendering his statements involuntary. Finally, he contends his statements were generally involuntary under the totality of circumstances.

The parties agree Mall preserved error on the issues of promissory leniency and general involuntariness through his motion to suppress. But the State asserts that he did not properly raise the *Miranda* claim. Mall mentioned that issue in the caption of the motion, but didn't discuss it elsewhere. And the district court didn't rule on it. Without argument or ruling, we cannot review this claim. *See Lamasters v. State*, 821 N.W.2d 856, 863 (Iowa 2012).

### 1. *Promissory leniency*

We turn to the promise-of-leniency claim. We review that claim for correction of legal error. *State v. Polk*, 812 N.W.2d 670, 674 (Iowa 2012) (applying common law evidentiary test). But under the totality-of-circumstances test arising

under the Fifth Amendment, our review is de novo. *State v. Madsen*, 813 N.W.2d 714, 722 (Iowa 2012).

We first analyze whether the interviewers dangled promises of leniency that improperly induced Mall to make incriminating statements. Confessions induced by threats or promises cannot be admitted into evidence. *Polk*, 812 N.W.2d at 674. For this analysis, we depart from the federal totality-of-the-evidence approach and start with the common law evidentiary test to determine whether Mall's statements were the product of promissory leniency. *See Madsen*, 813 N.W.2d at 726. Specifically, we look for promises that would create a "fair risk" that Mall would falsely confess. *See id.* We reject statements improperly induced to *any* degree. *Id.*

Mall argues that Hosch and Hudson repeatedly promised therapeutic intervention for both himself and his children. He claims those assertions presented "a perceived avenue of escape from prosecution . . . if only he would confess." Further, he contends that Hosch and Hudson overreached by implying that the twins could only receive proper treatment if he confessed.

It's true that an interviewer crosses the line by creating the false impression that treatment is an alternative to punishment if the suspect confessed. *State v. Howard*, 825 N.W.2d 32, 41 (Iowa 2012). But the State counters that the references to therapy here did not rise to the level of promissory leniency noted in *Howard*. And the State emphasizes that the rule is not intended to bar interviewers from discussing therapy. *See State v. Wilson*, No. 16-0555, 2017 WL 936125, at *3 (Iowa Ct. App. Mar. 8, 2017). In the State's view, the interviewers offered nothing specific to Mall in exchange for his confession.

After reviewing the recorded interview, as well as the depositions of both Hudson and Hosch, we agree with the State. The record does not show that the investigators induced Mall to believe there was a legal advantage to confessing. Neither Hosch nor Hudson crossed the line to impermissibly promise Mall leniency if he admitted sexually abusing his children.

Hosch first. In her deposition, she described her interviewing technique as "open-ended," allowing subjects to "explain things in their words." This approach is evident when Hosch opened the interview by asking Mall to explain his understanding of the allegations. In the same vein, Hosch told Mall she was "just trying to understand." She prefaced many of her questions with the phrase: "if you did something." Overall, her interrogation of Mall did not imply that he would gain any "special" benefit from confessing. *See Madsen*, 813 N.W.2d at 726. Hosch described the healing process generally and provided examples from her work as a DHS employee. But even when Hosch mentioned therapy for C.M. and E.M., she did not condition that help on Mall's confession. And she provided the disclaimer that a decision about whether Mall could see the twins would be "out of her hands" once the assessment period ended.

Hudson next. We acknowledge that some of the police chief's admonitions edged closer to that fine line of promissory leniency. Specifically, Hudson told Mall that "healing for those kids starts with you coming clean in here" and "if, for nothing else but the benefit of your kids, you need to tell us what happened." He also told Mall that "part of this thing hinges on you." These statements sound similar to language criticized in *Madsen* and *Polk*—urging a suspect to "come clean" and tying that cleansing to some unattainable advantage. *See id.*; *Polk*, 812 N.W.2d

at 676.  And, as shown in his deposition, Hudson did not have the power to divert a suspect from criminal charges to sex-offender treatment.  But when viewed in context, Hudson's statements did not imply that power.  In fact, Hudson disclaimed any guarantee that he could keep Mall out of prison, saying that decision was "not up to us."  What's more, Hudson did not suggest treatment as an *alternative* to prison.  *See Howard*, 825 N.W.2d at 41.  So we join the district court in rejecting Mall's claim of promissory leniency.

### 2. General involuntariness

Finding no promises of leniency, we next examine whether Mall's statements were involuntary under the totality-of-circumstances test.  *See State v. Payton*, 481 N.W.2d 325, 328–29 (Iowa Ct. App. 1992) (examining factors related to actions of both the suspect and interviewers).  These factors include the suspect's age, prior experience with the criminal process, influence of drugs, mental capacity, ability to understand and respond to questions, use of a *Miranda* warning, length of interview, use of deception, physical and emotional reactions to the questions, and any physical punishment.  *Id.*  We assess these factors before deciding whether the interviewers impaired Mall's capacity for self-determination. *See State v. Hodges*, 326 N.W.2d 345, 347 (Iowa 1982).  The State bears the burden to prove voluntariness by a preponderance of the evidence.  *State v. Cullison*, 227 N.W.2d 121, 127 (Iowa 1975).

Mall contends that, under the totality of the circumstances, his statements were involuntary.  He points to his "naivete" in the criminal arena and Hosch's use of deception.  This deception, according to Mall, involved implying that he "might see his kids again if he confessed."

The State denies that Mall's capacity for self-determination was overborne during the interview. *See Payton*, 481 N.W.2d at 328–29. As the State notes, Mall was an adult, employed, and did not appear to be under the influence of drugs, and there were no forms of deprivation or physical punishment present. The State also highlights that Mall understood the inquiries, checked his emotions, and formulated responses—even asking his own questions about being charged. Furthermore, the interview lasted less than an hour.[5]

We agree with the State that, weighing all of the pertinent factors, Mall's statements were voluntary. We don't discount Mall's inexperience in criminal settings. Nor that his emotions may have impacted the interview; Mall was tearful and claimed he lacked sleep. Indeed, Hudson stated in his deposition that Mall was "nervous and distraught" during the interview. On top of that, Mall was not given *Miranda* warnings. But despite those circumstances, we find Mall's statements reflected his "free and unconstrained choice" to speak with authorities. *See id.* at 328. He was responsive to the interviewers' requests for information and appreciated the consequences of his statements. *See Countryman*, 572 N.W.2d at 558. After our de novo review, we affirm the district court's denial of the motion to suppress on this constitutional basis.

### 3. Harmless error

Finally, as the State argues, even if Mall's statements were involuntary, any error in their admission was harmless. For promissory leniency, we apply the test

---

[5] Our supreme court has found that suspects' statements were voluntary after much longer interviews. *See, e.g.*, *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997) (three hours); *State v. Brown*, 341 N.W.2d 10, 16 (Iowa 1983) (two and one-half hours).

for non-constitutional harmless error. *See Howard*, 825 N.W.2d at 41 (stating that error is not cause for reversal unless a substantial right is affected). Because Mall maintained his innocence throughout the interview, its ultimate admission carried little force. Even his most incriminating statements did not admit wrongdoing; he said, "If I were to say something, it would ruin my life." And under the constitutional standard for harmless error, the State is able to show that the jury's verdict was "surely unattributable" to the admission of Mall's non-confession. *See State v. Peterson*, 663 N.W.2d 417, 430–431 (Iowa 2003).

**D. Competency of Child Witnesses**

Mall next contends the district court abused its discretion by determining the twins were competent witnesses. And he complains the court should have granted his request for a "taint hearing" to determine whether their testimony was influenced by their mother or other adults in whom they confided. We review rulings on competency for an abuse of discretion. *State v. Brotherton*, 384 N.W.2d 375, 377 (Iowa 1986).

On the question of holding a "taint hearing," the State quips: "[N]o Iowa case discusses such a creature." Indeed, Mall's request emanates from a New Jersey case, *State v. Michaels*, 642 A.2d 1372 (1994). That case recognized that "the use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony." *Michaels*, 642 A.2d at 1379. The New Jersey court determined a pretrial "taint hearing" was needed to ensure the reliability of child witnesses because they had been subject to "repeated, almost incessant" interviews

conducted by untrained investigators using suggestive techniques. *Id.* at 1382. The *Michaels* court acknowledged that "assessing reliability as a predicate to the admission of in-court testimony is a somewhat extraordinary step," but suggested it had some precedent in federal and New Jersey cases. *Id.* at 1381.

As the State explains on appeal, the *Michaels* approach has received a "mixed reception" from other jurisdictions. *See State v. Bumgarner*, 184 P.3d 1143, 1151 (Or. Ct. App. 2008) (criticizing taint hearings as conflating the competency of child witnesses with the reliability of their potential testimony). In fact, most jurisdictions that have considered the issue "have rejected the *Michaels* approach on the ground that existing procedures that address the competency and credibility of witnesses are adequate to deal with concerns regarding child testimony." *See Reece v. State*, 103 A.3d 1076, 1088 (Md. Spec. App. 2014) (collecting cases).

Today we take the majority position. The district court did not abuse its discretion in declining to hold a hearing that has no root in our rules, statutes, or case law. As the State suggests, such a gatekeeping step would usurp the jury's exclusive role in determining witness credibility. *See State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022); *see also State v. Cahill*, 972 N.W.2d 19, 34 (Iowa 2022) ("It was not the district court's job to decide on witness credibility prior to trial."). As the trial unfolded, the jury had a full opportunity to assess the reliability of the twins' testimony; they watched both CPC interviews and heard testimony from interviewer Haskins, as well as critiques of her interview technique. The jury also heard testimony from Sunnie and the child's therapist. On this record, a novel pretrial "taint hearing" was unwarranted.

That settled, we turn to the more customary question: Were the children competent to testify? As a reminder, they were four years old when the allegations arose and six years old by the time of trial. Mall contends they were not competent to testify, pointing to alleged inconsistencies and contradictions between their depositions and CPC interviews.[6]

In addressing his contention, we note that the competency of a witness "is not disproved by . . . mere testimonial inconsistency." *Brotherton*, 384 N.W.2d at 378 (cleaned up for readability). We presume witnesses are competent unless shown otherwise. Iowa R. of Evid. 5.601. A challenge to the competency of a child witness invokes three questions: (1) Is the child mentally capable of understanding the questions being asked? (2) Is the child able to formulate intelligent answers and communicate impressions and recollections regarding the incident about which the child is to testify? and (3) does the child understand the responsibility to tell the truth? *State v. Andrews*, 447 N.W.2d 118, 120 (Iowa 1989). *Andrews* clarified: "This three-part test does not materially differ from the traditional measure of a witness's competency: '(1) the mental capacity to understand the nature of the questions put and to form and communicate intelligent answers thereto and (2) the moral responsibility to speak the truth, . . . .'" *Id.* at 120–21 (internal citations omitted).

---

[6] Mall's argument relies on Iowa Rule of Evidence 5.104(a), which addresses "whether a witness is qualified, a privilege exists, or evidence is admissible." In *Cahill*, the supreme court noted rule 5.104(a) "is not a substantive rule of evidence. the relevant substantive rule is Iowa Rule of Evidence 5.601. It states that '[e]very person is competent to be a witness unless a statute or rule provides otherwise.'" 972 N.W.2d at 34. We apply that rule. Mall also relies on due process and fair trial rights under the federal and state constitutions.

To gauge the credibility of E.M. and C.M., the court watched their CPC interviews, considered their depositions as well as Sunnie's deposition, and reviewed the report of the defense expert witness—Dr. Katherine Jacobs, a clinical psychologist. Critically, the court spoke in chambers with each twin individually, along with their guardian ad litem.[7] After that thorough preparation, the court concluded that both E.M. and C.M. were competent to testify:

> [T]he children were overall very articulate for their age and clearly understood what was being asked. They formulated intelligent responses to each question. Both children also demonstrated, in their depositions, that they would not simply agree with whatever an adult suggested. . . . [Giving examples.] C.M. and E.M. were listening carefully to what was being asked, did not simply agree with the adult doing the questioning, and provided responsive answers to the questions. This all militates in favor of finding C.M. and E.M. competent to testify.
>
> Additionally, in their conversations with the undersigned in chambers, both children (who were then [six] years old) showed that they clearly understood questions that were asked. Both C.M. and E.M. demonstrated that they knew the difference between truth and falsity, and that they knew it was important to tell the truth.
>
> The [c]ourt easily concludes that both children are competent under the factors outlined in *Andrews*.

After our independent review of the record, we find the court did not abuse its discretion in concluding the children were competent to testify. We agree with

---

[7] In advance, both parties submitted proposed questions for the court to ask the children. Mall vaguely complains about the court declining to ask some of his questions. The court's ruling explains some of Mall's most desired questions sought answers where the children would have no personal knowledge or that presumed events the children denied occurred. The court declined to ask those questions as they would likely confuse the children and would not have furthered its *Andrews* analysis. Mall's claim is underdeveloped on appeal and amounts to no more than a passing mention, so we consider it waived. *See Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 431 n.2 (Iowa 2002) (holding random mention of an issue without elaboration or supporting authority fails to preserve the claim).

Mall that there were inconsistencies[8] in their rendition of the events between their CPC interview and their deposition. And we also agree both twins had difficulty maintaining their concentration during their CPC interview, which occurred nearly two years before trial. But those facts do not mean they could not understand the attorneys' questions or the responsibility to speak truthfully at the time of trial. *See Brotherton*, 384 N.W.2d at 378 (noting testimonial inconsistency "is a matter directed to the weight to be afforded the witness' testimony by the jury"). Their in-chambers conversation with the judge showed that both E.M. and C.M. could comprehend the questions put to them. They responded appropriately and displayed the intelligence to carry on relatively complex discussions, consistent with their age. We, like the district court, note their ability to correct the questioner's mistakes as they arose. The court also reasonably assessed their understanding of the moral responsibility to tell the truth. Both children identified when the judge lied and expressed disapproval of lying. We thus conclude the court's decision was neither unreasonable nor untenable.

### E. Sufficiency of the Evidence

Mall also contests the sufficiency of the evidence to convict him, complaining "[t]he State's entire case rests on the testimony of the twins." The State offered no DNA or physical evidence of sexual abuse. He also argues that the State "apparently deliberately" did not investigate the incident at the daycare a few months before the twins' disclosures. He further notes the State did not search his phone or internet history for any interest in child sexuality.

---

[8] Mall's briefing on this issue does not identify the specific inconsistencies. But he points to more specific facts in his sufficiency challenge, discussed below.

"We review sufficiency of the evidence claims for correction of errors at law." *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We consider whether, when taken in the light most favorable to the State, the verdicts are supported by substantial evidence. *Id.* Evidence is substantial if it would convince a rational trier of fact that Mall is guilty beyond a reasonable doubt. *See id.* "[A] defendant need not file a motion for judgment of acquittal to challenge the sufficiency of the evidence on direct appeal." *State v. Crawford*, 972 N.W.2d 189, 198 (Iowa 2022).

For the jury to find Mall guilty of two counts of sexual abuse in the second degree, it had to find both:

> 1. On or about the calendar year 2019 through late March 2020, . . . [Mall] performed a sex act with [each child.]
> 2. [Mall] performed the sex act with [each child] while the child was under the age of 12 years.

To find Mall guilty of lascivious acts with E.M., the State had to prove:

> 1. On or about the calendar year 2019 through late March 2020, . . . [Mall], with or without E.M.'s consent, did permit or cause E.M. to fondle or touch the defendant's genitals or pubes.
> 2. [Mall] did so with the specific intent to arouse or satisfy the sexual desires of [Mall] or E.M.
> 3. [Mall] was then 16 years of age or older.
> 4. E.M. was then under the age of 14 years.

To find Mall guilty of lascivious acts with C.M., the State had to prove:

> 1. On or about the calendar year 2019 through late March 2020, . . . [Mall], with or without C.M.'s consent, did:
>    a. fondle or touch the pubes or genitals of C.M.; or
>    b. permit or cause C.M. to fondle or touch [Mall's] genitals or pubes.
> 2. [Mall] did so with the specific intent to arouse or satisfy the sexual desires of [Mall] or C.M.
> 3. [Mall] was then 16 years of age or older.
> 4. C.M. was then under the age of 14 years.

And finally, to prove two counts of assault with intent to commit sexual assault, the State had to show:

> 1. On or about the calendar year 2019 through late March 2020, . . . [Mall] assaulted [each child.]
> 2. [Mall] did so with the specific intent to commit a sex act by force or against the will of [each child.]

The instruction also said, "[An] [a]ssault is committed when a person does an act which is meant to result in physical contact which will be insulting or offensive to another person, when coupled with the apparent ability to do the act."

When reviewing for substantial evidence, "[i]t is not our place 'to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury.'" *Brimmer*, 983 N.W.2d at 256 (citation omitted). "It is also for the jury to decide which evidence to accept or reject." *Id.* So the jury could find proof of the allegations within the CPC interviews and testimony, despite some inconsistencies.

During his CPC interview, which the court played for the jury, Haskin asked four-year-old C.M. a series of questions about whether he had gotten "touches" on his "wiener."[9] At first, he said no. But shortly after that, he explained his father washed him with soap in the shower and "after that he sucks my wiener," specifying that Mall used "his mouth" and "his tongue." C.M. physically demonstrated how his father would bend down on one knee while doing so. C.M. said that his father "likes me sucking his wiener forever." The boy also shared his father's admonition

---

[9] Both children used the word "wiener" to refer to a penis.

not to tell Sunnie. C.M. consistently told Haskin that E.M. was not present while this happened, nor did he see anyone touching E.M.'s "pee pee."[10]

At trial, six-year-old C.M. testified he and his father would be sitting in the bathtub taking a bath when his father "was sucking my wiener." C.M. further testified he "sucked" his "dad's wiener right by where his pee comes out of." The boy's testimony also described sexual contact between his hand and his father's penis. C.M. demonstrated what the sucking and hand movement looked like. He further testified his father told him not to tell anyone.

In her CPC interview, E.M. said no one had "touche[d her] pee pee" or her bottom. But she also said "my dad him want him suck his wiener." When asked "has someone sucked dad's wiener?" E.M. answered "[C.M.] and me." Haskin said, "tell me about sucking dad's wiener," and E.M. responded "he lets us" and that it happened "in the tubbie" where "he'll let us play with it." When asked what she "sucks his wiener with," she gestured to her mouth and said "him likes it . . . he tells us I like it." She agreed with C.M. that "him don't want mom to know."

At trial, E.M. testified to "sucking my dad's wiener" in the bathtub. According to her testimony, sometimes it happened during a bath and sometimes during a shower. Demonstrating, she explained that his "wiener" would go in her mouth. She also testified her father would be sitting down in the tub. And she testified he told her to "[k]eep it a secret." If she told, she was afraid she would get in trouble.

The State also called Haskin, the CPC interviewer, as a witness. She explained her interview methodology and gave general information about delayed

---

[10] Both children used the word "pee pee" to refer to female genitals.

disclosure and other common aspects of child sexual abuse. On cross-examination, she agreed that Sunnie had explained her concerns before the interview. Haskin also responded to criticism that she "skew[ed] the interview" by repeating certain words. She explained she embraces the terms the child uses and asks follow-up questions. She denied defense allegations that her interview technique was suggestive.

The jury also heard testimony from the children's therapist, Jill Bryant.[11] The psychologist detailed her intake procedure, agreeing that she was aware there were allegations of sexual abuse. She testified she and Sunnie held those initial conversations outside the presence of the children. She explained the process of play therapy and what she discussed with the children. She described the rapport she built with both children. But Dr. Bryant did not give extensive testimony about what, if anything, the children told her during their therapy sessions.

The defense called rebuttal witness Dr. Jacobs. She testified based on her professional experience that false memories can occur in therapeutic settings. And she discussed the suggestibility of children. She opined that the CPC interview was flawed in terms of Haskin's interviewing technique. Jacobs criticized Haskin for bringing the children's attention to particular terms and making them more salient through repetition. In Jacobs's view, the children were unreliable reporters.

The defense also called Shelley Drahos, the childcare provider. She testified to Sunnie's report that C.M. said something sexually inappropriate at

---

[11] Dr. Bryant was no longer their therapist by the time of trial.

home that he had heard at her daycare. Drahos agreed to pay closer attention to the children's conversations. After the accusations against Mall came out, Drahos recalled someone from the DHS contacting her. But that person only spoke with her for about five minutes about Sunnie's report. They did not contact her again.

Taking the stand in his own defense, Mall denied the sex acts the children reported. He believed, "This is two kids talking. This is something they saw or heard . . . we'll find out it was all just hearsay, talk, or whatever."

On appeal, Mall does not focus on any specific elements of the six offenses that he believes the State did not prove. Instead, he urges a general denial of the children's version of events. Mall argues there were too many inconsistences in the children's testimony for a reasonable fact finder to find him guilty.[12] But the jury is free to credit or reject testimony as it sees fit. *See State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006). Under that proposition, the jury could have discounted Jacobs's criticism of the CPC interview. It could have also rejected Mall's suggestion that Sunnie and Bryant unduly influenced the children into making false accusations. And despite discrepancies between their CPC interviews and trial testimony, the jury could have believed the core of the children's allegations.

---

[12] Mall asserts the children gave "hopelessly inconsistent and confusing" testimony, but identifies only a few relatively minor inconsistencies. For example, unlike his CPC interview, C.M. testified at trial that the first person to talk to him about "sucking wieners" was Mall. That testimony contradicted C.M.'s 2019 story about another child at daycare. Mall also pointed out that E.M. testified she and C.M. were together while she was "sucking her dad's wiener"—which differed from C.M.'s testimony. And E.M. testified her father was sitting in the bathtub, which Mall asserts is "physically impossible, given the dimensions of the bathtub."

Mall also complains that the State failed to adequately investigate the daycare as the source of the twin's exposure to sexual matters.[13]  But contrary to Mall's complaint, substantial evidence cases do not place an affirmative duty on the prosecution to "rule out every hypothesis" other than guilt.  *See State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008).  As it happened, the jurors heard Sunnie's recollection of the children saying in 2019 that a playmate at daycare had exposed "his wiener" to the other children.  They heard the twins' later denials or lack of memory of that incident.  Again, the jurors were free to use that information in assessing the credibility of the children's allegations against Mall.

The same is true for Mall's concern that law enforcement did not check his cell phone or computer browser history for images that would "corroborate" his interest in child pornography.  Defense counsel cross-examined Chief Hudson on this point: "So if a person is arrested and charged with six separate alleged crimes of child abuse, are you telling this jury that would not offer you any probable cause to obtain a warrant to check phones and computers?"  Hudson responded:

> Maybe a more seasoned sex crimes investigator, not a police chief that handles all kinds of different things.  I didn't feel at the time I had probable cause.  There was nothing alleged by the alleged victims in this case that cell phones were used or cameras were used or that any type of pornography was shown to them or anything; so I didn't consider it.

The State was not required to offer that kind of "corroborating" evidence to prove the sex crimes charged.  The testimony of the alleged victims was enough.

---

[13] Mall testified that when Sunnie confronted him with the children's allegations his thoughts went to what C.M. had said "six months prior from the daycare.  So, in my mind, I automatically started connecting the dots to that as kind of the only viable option."

*See* Iowa R. Crim. P. 2.21(3); *see also State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) (holding that testimony of alleged rape victim was "by itself sufficient to constitute substantial evidence of defendant's guilt"). The children's testimony was generally consistent with their CPC interviews—their father had them perform sex acts on him in the shower or bath. And in C.M.'s case, allow Mall to perform sex acts on him. Those sex acts included the children fondling or touching Mall's genitals with their hands, putting his penis in their mouths, and putting C.M.'s penis into Mall's mouth. *See* Iowa Code § 702.17 (defining sex acts).

What's more, both children testified their father told them not to tell their mother. They expressed fear about telling anyone what was happening, believing they would get in trouble. The jury could reasonably conclude Mall instructed the twins not to tell because the acts were performed with the specific intent of arousing or satisfying his sexual desires. Taken together with all reasonable inferences and in the light most favorable to the State, we conclude there is substantial evidence to support the jury's verdicts. *See State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022) (reinforcing "deference to the jury's resolution of disputed factual issues").

### F. Trial Delay

Mall also challenges the district court's denial of his motion for mistrial after a mid-trial delay for two unrelated medical emergencies. On the second day of trial, Sunnie took the witness stand, followed by the children, C.M. and E.M. The trial recessed at just after 5:00 p.m. Only then: bad luck. First, the county attorney's mother suffered a stroke, causing him to ask for a one-day recess. Second, that delay was extended by another half-day when the judge's son

underwent emergency surgery. Mall asserts he was prejudiced by these delays because they came just after the twins' testimony, leaving "this jury out with the last words in their ears [being from] the two children."

Before addressing the merits, we consider the State's error-preservation challenge. The State agrees that Mall timely moved for a mistrial based on the first delay. But not so on the second one—waiting for two days after the extended recess to renew his motion for mistrial. As the State points out, a party seeking a mistrial must do so when the grounds first become apparent. *See State v. Gibb*, 303 N.W.2d 673, 678 (Iowa 1981).

During oral arguments, Mall's counsel offered no reason for not renewing his mistrial motion before the trial resumed on the afternoon of day four.[14] Instead, counsel asserted that the original motion covered both delays. The record does not support that assertion. In fact, the court told Mall that if the delay went beyond a day, he could renew his motion. Yet we choose to bypass error preservation and consider the impact of both delays. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999) (opting to overlook "serious preservation-of-error problems and affirm on the merits").

We review mistrial motions for an abuse of discretion. *State v. Wade*, 467 N.W.2d 283, 285 (Iowa 1991). While district courts have broad leeway in ruling on these motions, abuse of discretion may be shown when the record lacks support

---

[14] The impetus for the second mistrial motion was Dr. Bryant's vouching testimony. Mall asked counsel to "incorporate the prior motion for mistrial on the delay issues again." The court responded: "the motion is still denied."

or logic for the determination made. *State v. Hunt*, 801 N.W.2d 366, 373 (Iowa Ct. App. 2011).

Mall believes the court abused its discretion because the trial recess followed the children's testimony. He describes their testimony as "emotional evidence" that marked "the pinnacle of the State's case." He contends he was prejudiced by the jury having an extra day and one-half to ponder "those words and images" invoked by the twins' testimony. Mall adds that the delay extended the trial past the expected five days, causing the jurors to feel rushed in their deliberation.

The State responds that the delay was not unreasonable given the level of preparation by both sides, and such emergencies are not unheard-of during trial. The State also argues that the jury admonition was appropriate.[15] As for the prejudice claimed by Mall, the State contends it would be speculation to assume what the jurors thought of the children's testimony.

Granting a mistrial is proper when an impartial verdict could not have been reached due to "obvious procedural error." *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006). But even in the face of error, a jury admonition may suffice to "deal with the problem." *State v. Hamilton*, 335 N.W.2d 154, 161 (Iowa 1983).

To set the scene, the county attorney—who was trying the case alone—emailed the court around midnight (after the second day of trial) to let the judge

---

[15] Following the decision to take the one-day recess, both parties discussed and agreed to an instruction to the jury that, generally, the delay was "unforeseen" and "not the fault of either parties." When the trial resumed the next day, the judge provided an explanation to the jury about the cause of the late start, explaining his son's medical emergency and that the delay was not the fault of either party.

know that his mother was rushed to intensive care at University Hospitals in Iowa City after suffering a major stroke. The next morning, the county attorney called into a hearing asking for a one-day recess: "If I could have one day, I can be back in the saddle, so to speak, tomorrow. I don't think I'm in good enough shape to do it today on a half-hour sleep if that makes sense." Defense counsel was sympathetic to the prosecutor's situation, but on behalf of his client resisted the recess. The court granted the county attorney's request, reasoning: "[W]e don't know what the jury thought about the testimony of the children. We don't know that there's any prejudice simply by a one-day recess." The court then denied Mall's motion for a mistrial on the same rationale.

We find the district court's ruling was reasonable under the circumstances. *See State v. Brewer*, 247 N.W.2d 205, 211 (Iowa 1976) (noting that discretion to rule on a mistrial motion "presupposes the trial court has a choice to determine between competing considerations"). As the court found, Mall cannot substantiate his conjecture that his case was prejudiced by the jury having extra time to mull the children's testimony.[16] Nothing indicates how the jury processed that evidence.

Our calculus is the same for the second delay. Mall cannot show he was prejudiced by an extra half-day recess based on the judge's family emergency. As the court noted, trial breaks are not uncommon as, for example, when courts adjourn for the weekend. Delays, both expected and unexpected, are not cause for a mistrial unless they influence the jury's verdict. *See United States v. Horne*,

---

[16] In fact, on appeal, Mall calls their testimony "hopelessly confusing and contradictory." If that were true, the delay would not have harmed his defense.

755 F.2d 691, 692 (8th Cir. 1985) (denying motion for mistrial after court took an early recess due to a sick juror).

One last point. The admonition—agreed to by the parties—served to dispel any doubt that the jurors may have had about the cause of the delays. We recognize such admonitions as an appropriate response to possible prejudice. *Brotherton*, 384 N.W.2d, at 381. For these reasons, Mall is not entitled to a new trial based on the day and a half delay.

### G. Cumulative Error

Finally, Mall asserts that the cumulative effect of the trial errors warrants relief. *See State v. Carey*, 165 N.W.2d 27, 36 (Iowa 1969). When we "find merit in each of defendant's assigned errors" but "none alone is sufficient to require a new trial," we may determine "the cumulative effect has been to deprive the defendant of a fair trial." *Id.* Because we have found no merit in any of Mall's appeal claims, we find no accumulation of error has deprived him of a fair trial.

**AFFIRMED.**